Filed 11/9/15  Miller v. Danaher Corp. CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| SELINE MILLER,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>DANAHER CORPORATION et al.,<br><br>Defendants and Respondents. | H040128<br>(Santa Clara County<br>Super. Ct. No. 1-11-CV213390) |

Plaintiff Seline Miller appeals from the judgment following the granting of summary judgment in favor of defendants Danaher Corporation (Danaher) and Molecular Devices, LLC (MD), a subsidiary.  (See Code Civ. Proc., § 437c.)[1]  Miller, a former employee of MD, sued those companies for damages for wrongful retaliation in violation of public policy (first cause of action), wrongful termination in violation of public policy (second cause of action), and violation of Government Code section 12945.2 (third cause of action).  Government Code section 12945.2 may be cited as the Moore-Brown-Roberti Family Rights Act (Gov. Code, § 12945.1) but it is commonly referred to as the California Family Rights Act (CFRA).[2]  (See Cal. Code Regs., tit. 2, § 11087, subd. (b).)

---

[1] All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

[2] The CFRA is California's counterpart to the federal Family and Medical Leave Act of 1993 (FMLA) (29 U.S.C. §§ 2601-2654).  (*Richey v. AutoNation, Inc.* (2015) 60 Cal.4th 909, 913, 919.)  "California courts routinely rely on federal cases interpreting the FMLA when reviewing the CFRA.  (*Neisendorf* [*v. Levi Strauss & Co.* (2006) 143 Cal.App.4th 509,] 514, fn. 1.)"  (*Rogers v. County of Los Angeles* (2011) 198 (continued)

The trial court granted MD's motion for summary judgment, in which Danaher sought to join. The court found defendants were entitled to summary judgment because MD's "adverse employment decision was reached no later than June 2011" and the only alleged protected activities occurred later and, consequently, there was no causal link between her alleged protected activity and the adverse employment decision.

Miller maintains that a trier of fact could reasonably find that the proffered reason of deficient performance was "fabricated and pretextual"[3] based on the evidence and "multiple disputed issues of material fact" exist. Defendants assert that the trial court correctly concluded that there is no triable issue as to causation. We conclude that the evidence adduced on summary judgment raises triable issues of material fact as to causation, namely (1) whether the final decision to terminate Miller on December 13, 2011 was made after Miller's December 12, 2011 e-mail expressly invoking the CFRA and (2) whether Miller's attempt to exercise CFRA/FMLA rights was a substantial motivating reason for her termination on December 13, 2011.

In addition, the trial court did not consider Danaher's separate motion for summary judgment, finding it moot. Danaher brought its motion on the ground that it was not Miller's employer. Danaher's motion is not moot and the trial court must rule on it.

Accordingly, we reverse and remand for further proceedings.

---

Cal.App.4th 480, 487; see Cal. Code Regs., tit. 2, § 11096 [incorporating by reference federal FMLA regulations to "the extent that they are within the scope of Government Code section 12945.2 and not inconsistent with [the regulations implementing the CFRA], other state law, or the California Constitution"].)

[3] At the summary judgment stage, this case was not presented as a mixed-motive case. The burden-shifting framework of *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792 (*McDonnell Douglas*), which we will discuss, "presupposes that the employer has a single reason for taking an adverse action against the employee and that the reason is either discriminatory or legitimate." (*Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, 215 (*Harris*).)

# I

*Procedural History*

On November 17, 2011, plaintiff filed a complaint for wrongful retaliation. On December 15, 2011, defendants filed their answer to the complaint.

On July 5, 2012, Miller filed her first amended complaint. On July 18, 2012, defendants filed their answer to the first amended complaint.

Late in February 2013, MD filed its motion for summary judgment, or in the alternative summary adjudication, and Danaher filed its motion for summary judgment on the ground that Miller could not establish that Danaher was her employer. The same attorneys represented both defendants and signed the notices of motion. MD's notice of motion and Danaher's notice of motion stated: "Danaher Corporation—the parent company of Molecular Devices, LLC and also a named Defendant in this action—has filed a separate motion for summary judgment asserting that it was not the employer of Plaintiff. If its separate motion is not granted, Danaher Corporation hereby joins in Molecular Devices' Motion for Summary Judgment/Adjudication."[4] The hearings on the motions were set for May 9, 2013.

---

[4] Even though it did not file a document captioned "Joinder in Motion," Danaher notified the trial court in its notice of motion that it was joining in MD's motion if the court denied relief on its separate motion. Without any citation to authority, Miller now claims that Danaher never joined in MD's motion for summary judgment or summary adjudication. We would ordinarily deem such an unsupported contention waived. (See *People v. Stanley* (1995) 10 Cal.4th 764, 793 (*Stanley*).) California courts have determined, however, that a party cannot obtain a summary judgment by joining in another party's motion for summary judgment because of the requirement that a moving party file a separate statement of undisputed facts. (See Stats. 2011, ch. 419, § 3, p. 4222 [former § 437c, subd. (b)]; § 437c, subd. (b)); *Magana Cathcart McCarthy v. CB Richard Ellis, Inc.* (2009) 174 Cal.App.4th 106, 119; *Village Nurseries v. Greenbaum* (2002) 101 Cal.App.4th 26, 46-47; *Frazee v. Seely* (2002) 95 Cal.App.4th 627, 635-636.) In any event, as subsequently explained in detail, we conclude that triable issues of material fact remain on MD's motion and the trial court must rule on Danaher's separate motion upon remand.

On April 8, 2013, plaintiff filed an ex parte application for an order shortening time for hearing on a motion for an order compelling defendants to produce persons most qualified (PMQ) for deposition. On April 8, 2013, the trial court granted the application.

On April 12, 2013, plaintiff filed a motion to compel defendants to produce their PMQ's for deposition. In March of 2013, Miller had served 10 separate notices of deposition of MD's PMQ on various topics. One of the notices sought to depose MD's PMQ on the topic of complaints received regarding Miller, her work, or her errors from "any source" during December 1, 2009 through December 13, 2011 and requested production of documents pertaining to complaints regarding Miller. After a hearing on April 19, 2013, the matter was taken under submission.[5]

On April 25, 2013, Miller requested a continuance to permit her to obtain "essential evidence."

On May 9, 2013, the court held a hearing on defendants' motions for summary judgment.

On May 23, 2013, the trial court denied Miller's request for a continuance. It granted MD's motion for summary judgment. It denied as moot Danaher's separate motion for summary judgment and Miller's request for judicial notice submitted with her opposition to that motion.

*II*

*MD's Motion for Summary Judgment or Summary Adjudication*

A. *Miller's Request for Continuance*

Plaintiff requested a continuance under former section 437c, subdivision (h), due to defendants' alleged delay or failure to promptly produce requested discovery. The court deemed the request to be discretionary and denied it. The court explained that

---

[5] The parties indicate that the trial court never issued an order resolving the motion to compel defendants to produce their PMQ's for deposition.

4

"[t]he declaration by Counsel Eric Kastner does not satisfy the requirements for a mandatory continuance under [section] 437c(h) and also fails to show good cause for a discretionary continuance."

At the time of the court's ruling on the request, former section 437c, subdivision (h), provided in pertinent part:  "If it appears from the affidavits submitted in opposition to a motion for summary judgment or summary adjudication or both that facts essential to justify opposition may exist but cannot, for reasons stated, then be presented, the court shall deny the motion, or order a continuance to permit affidavits to be obtained or discovery to be had or may make any other order as may be just."  (Stats. 2011, ch. 419, § 3, pp. 4223-4224 [former § 437c, subd. (h)]; see § 437c, subd. (h).)

"An opposing party's declaration in support of a motion to continue the summary judgment hearing should show the following:  (1) '*Facts* establishing *a likelihood that controverting evidence may exist and why* the information sought is *essential* to opposing the motion'; (2) 'The *specific reasons* why such evidence cannot be presented at the present time'; (3) 'An estimate of the *time* necessary to obtain such evidence'; and (4) 'The specific steps or procedures the opposing party intends to utilize to obtain such evidence.'  (Weil & Brown, Cal. Practice Guide:  Civil Procedure Before Trial (The Rutter Group) ¶ 10:207.15.)"  (*Johnson v. Alameda County Medical Center* (2012) 205 Cal.App.4th 521, 532 (*Johnson*).)

" 'Code of Civil Procedure section 437c, subdivision (h) requires more than a simple recital that "facts essential to justify opposition may exist." ' (*Lerma v. County of Orange* (2004) 120 Cal.App.4th 709, 715.)  'The statute cannot be employed as a device to get an automatic continuance by every unprepared party who simply files a declaration stating that unspecified essential facts may exist.  The party seeking the continuance must justify the need, by detailing both the particular essential facts that may exist and the specific reasons why they cannot then be presented.'  (*Id*. at pp. 715-716.)"  (*Johnson*, *supra*, 205 Cal.App.4th at p. 532.)

5

" 'When a party makes a good faith showing by affidavit demonstrating that a continuance is necessary to obtain essential facts to oppose a motion for summary judgment, the trial court must grant the continuance request. [Citation.] "Continuance of a summary judgment hearing is not mandatory, however, when no affidavit is submitted or when the submitted affidavit fails to make the necessary showing under [Code of Civil Procedure] section 437c, subdivision (h). [Citations.] Thus, in the absence of an affidavit that requires a continuance under section 437c, subdivision (h), we review the trial court's denial of appellant's request for a continuance for abuse of discretion." ' (*Park v. First American Title Co*. (2011) 201 Cal.App.4th 1418, 1427.)" (*Johnson*, *supra*, 205 Cal.App.4th at p. 532.)

On appeal, Miller maintains that the continuance was necessary to take the depositions of MD's PMQ's because the declarations of Albert Acevedo, MD's Vice President of Finance, and Johann Noor Mohamed, MD's Global Controller, were too vague and identifying the complaints against Miller and assessing their gravity was "essential to flesh out Miller's opposition to summary judgment." Miller has deposed both Acevedo and Mohamed who were her superiors and the alleged decision makers. The declaration in support of a continuance did not demonstrate that complaints about her received by persons other than Acevedo and Mohamed were essential to opposing the motion. The declaration filed in support of her request for a continuance does not satisfy section 437c, subdivision (h), since it does not show that "facts essential to justify opposition *may exist* but cannot, for reasons stated, then be presented." (§ 437c, subd. (h), italics added.) In the absence of a mandatory right to a continuance, "we review the trial court's denial of appellant's request for a continuance for abuse of discretion. [Citation.]" (*Cooksey v. Alexakis* (2004) 123 Cal.App.4th 246, 254.)

"[D]iscretion is abused only when the court exceeds the bounds of reason, all circumstances being considered. [Citations.]" (*People v. Beames* (2007) 40 Cal.4th 907, 920.) The party challenging a discretionary ruling on a request for a continuance bears

6

the burden of establishing that the court abused its discretion. (*Ibid.*) Miller fails to demonstrate that the trial court abused its discretion by denying a continuance.

B. *Standard of Review*

" 'On appeal after a motion for summary judgment has been granted, we review the record de novo, considering all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained. [Citation.]' (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334.) A motion for summary judgment is properly granted 'if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' (Code Civ. Proc., § 437c, subd. (c).)" (*Biancalana v. T.D. Service Co.* (2013) 56 Cal.4th 807, 813.) "In performing our de novo review, we view the evidence in the light most favorable to plaintiff as the losing party. [Citation.]" (*Johnson v. American Standard, Inc.* (2008) 43 Cal.4th 56, 64.)

"First, and generally, from commencement to conclusion, the party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 (*Aguilar*), fn. omitted.) "Second, and generally, the party moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact; if he carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact." (*Ibid.*)

"[E]ven though the court may not weigh the plaintiff's evidence or inferences against the defendants' [*sic*] as though it were sitting as the trier of fact, it must nevertheless determine what any evidence or inference *could show or imply to a reasonable trier of fact.*" (*Aguilar, supra,* 25 Cal.4th at p. 856.) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find

7

the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof."  (*Id*. at p. 850, fn. omitted.)

C.  *Pleadings Frame the Issues*

When a court considers a motion for summary judgment, it must identify the issues framed by the pleadings.  (*Turner v*. *Anheuser-Busch*, *Inc*. (1994) 7 Cal.4th 1238, 1252.)  The pleadings " 'set the boundaries of the issues to be resolved at summary judgment.'  (*Oakland Raiders v*. *National Football League* (2005) 131 Cal.App.4th 621, 648; see generally *Ann M*. *v*. *Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 673 [disapproved on another ground in *Reid v*. *Google*, *Inc*. (1993) 50 Cal.4th 512, 527, fn. 5] ['pleadings serve as the outer measure of materiality in a summary judgment proceeding'].)"  (*Conroy v*. *Regents of University of California* (2009) 45 Cal.4th 1244, 1250.)  "[T]he materiality of a disputed fact is measured by the pleadings" (*ibid*.) and defendants are "not obliged to ' " ' "refute liability on some theoretical possibility not included in the pleadings," ' " ' simply because such a claim was raised in plaintiff's declaration in opposition to the motion for summary judgment.  (*County of Santa Clara v*. *Atlantic Richfield Co*. (2006) 137 Cal.App.4th 292, 332.)"  (*Id*. at p. 1254.)  A "plaintiff wishing 'to rely upon unpleaded theories to defeat summary judgment' must move to amend the complaint before the hearing.  [Citations.]"  (*Oakland Raiders v*. *National Football League*, *supra*, at p. 648, fn. omitted.)

Miller's first amended complaint alleged that "in early July 2011, [she] was forced to complain to the Company regarding certain violations of recognized accounting standards by Mr. Acevedo, and possible related legal violations."  Miller felt she had a fiduciary duty to bring "Acevedo's repeated deviations from ethical practices" to the attention of Acevedo's superior, Henry Carroll MD's Vice President/Chief Financial Officer (CFO).  Miller "did so verbally and in emails to Mr. Carroll during the first two weeks of July 2011."

That complaint specifically alleged that, "[a]t the close of June 2011," Acevedo asked Miller to "approve a 'true up' journal entry for the Company's Austria entity . . . to record a EUR176,000 credit to the Standard Cost of Goods Sold ('CGS'), instead of to Other Income as recognized accounting rules required." It alleged that accounting treatment was "improper, as deviating both from GAAP [Generally Accepted Accounting Practices] and from the Company's standard Purchase Accounting policies." Acevedo also allegedly "insisted that appropriately $180,000 be written off to scrap in a Received Not Invoiced (RNI) accounting entry," which was allegedly "improper under GAAP and Company practices, which require that discrepancies be written off to Purchase Price Variance." It was further alleged that, on July 6, 2011, Acevedo inaccurately and untruthfully told his superior, Carroll, that "all Company procedures had been followed respecting the Excess & Obsolescence ('E&O') Reserve of the Company's Japan entity for the quarter."

The first amended complaint alleged that, although Carroll promised her complaints would be kept confidential, they were not kept confidential. It further alleged that, after she reported Acevedo's improper practices, "Acevedo's attitude and actions toward her profoundly changed." "Acevedo significantly reduced the level of prominence of [her] responsibilities while increasing her daily workload to a punitive intensity with duties historically performed by more than a single employee."

Miller was allegedly passed over for promotion, "stripped" of "her most significant duties," and heaped with "work of a semi-administrative 'dead-end' nature." "In August and September 2011, two of [her] most significant duties, Consolidations accounting oversight and accounting support for the Company's Brazil entity, were removed from her responsibilities." In addition, "the Company actively undermined her ability to manage her own staff" by not allowing her to be "present for certain training of employees reporting to her," ignoring her "standard requisition requests regarding

9

personnel reporting to her," and deciding against the hiring of a candidate whom she wished to hire.

The first amended complaint also alleged that "[s]hortly before [her] termination on December 13, 2011 she asked her supervisor, Johann Noor Mohamed, for four (4) days leave at the end of December to visit her family in Chicago and care for her elderly and infirm father." "Mohamed denied [her] request for time off, expressly telling her she was critical to the finance group and that he needed her to remain at work through the end of 2011." "On December 12, 2011, Ms. Miller emailed . . . Mohamed renewing her request for family medical leave, further explaining her request to take the leave in order to care for her sick father . . . . The following day, on December 13, 2011, . . . Mohamed emailed back acknowledging Ms. Miller's request for family medical leave under the Family and Medical Leave Act and the California Family Rights Act, but repeating his decision that he needed her to work through the end of the year. However, he directed her to consult the Company's HR department regarding taking family leave. The same day, Ms. Miller spoke to Ms. LaRoche of HR and informed her of her request for family medical leave. An hour later, . . . Mohamed fired Ms. Miller."

The first amended complaint contains a cause of action for wrongful retaliation in violation of public policy and a cause of action for wrongful termination in violation of public policy. That complaint alleges two separate public policies.

It is alleged that "[f]ostering compliance by accounting professional with all applicable accounting standards is a fundamental, well-established and substantial public policy issue under State statutes and regulations" as reflected in Business and Professions Code section 5018 and Code of Regulations, title 16, section 58.[6] The first cause of

---

[6] Mandatory rules of professional conduct may constitute public policy. (Cf. *General Dynamics Corp. v. Superior Court* (1994) 7 Cal.4th 1164, 1188-1189 [under most circumstances, an in-house attorney would have a retaliatory discharge cause of action against his or her employer if "the attorney was discharged for following a (continued)

10

action states, and the second cause of action by incorporation states, that by "shining a light on improper accounting treatments [by] the Company's officer, [she] was engaging in protected activity under State law." The second cause of action alleges that "the Company's actions were intended . . . to punish [her] for seeking to comply with her professional statutory obligations as a CPA by making internal complaints regarding her superior's violations of his professional obligations as a CPA . . . ."

The second public policy is alleged to be the protection of an employee's right to family leave to care for an infirm parent as reflected in Government Code section 12945.2 (CFRA), Labor Code section 233, title 29 of the United States Code, section 2601 et seq. (FMLA). Both the first and second causes of action allege that Miller was terminated in retaliation for requesting family leave.

The third cause of action alleges that Miller was terminated because she exercised her statutory leave rights under the CFRA.

D. *Evidence of Miller's Professional Disagreements Before July 2011 is Immaterial*

On appeal, Miller asserts that the trial court prejudicially erred in not considering Miller's evidence of her "complaints" concerning accounting irregularities in January and June of 2011 in ruling on the summary judgment motions. In granting summary judgment, the trial court stated that "[t]he pleadings serve as the outer measure of materiality in a summary judgment motion, and the motion may not be granted or denied on issues not raised by the pleadings." The court expressly "disregarded as a basis for

---

mandatory ethical obligation prescribed by professional rule or statute"].) In addition, although not mentioned in Miller's first amended complaint, Labor Code section 1102.5 "reflects the broad public policy interest in encouraging workplace whistle-blowers to report unlawful acts without fearing retaliation." (*Green v. Ralee Engineering Co.* (1998) 19 Cal.4th 66, 77; see *Ferrick v. Santa Clara University* (2014) 231 Cal.App.4th 1337, 1344-1345.) "[A]n employee need not prove an actual violation of law; it suffices if the employer fired him for reporting his 'reasonably based suspicions' of illegal activity. [Citation.]" (*Green v. Ralee Engineering Co.*, *supra*, at p. 87.)

denying the motion" "[a]ny arguments based on facts or issues not pled in the [first amended complaint]." We discern no error.

Miller's so-called "complaints" in January and June of 2011 concern different accounting matters and occurred in different time frames than the reports made to Carroll in July 2011 and they did not involve informing higher-ups of alleged wrongdoing by Acevedo. The first amended complaint (and the original complaint) focused specifically on Acevedo's alleged ethical deviations that Miller reported to Carroll, Acevedo's superior, during the first two weeks of July 2011.

Miller tried to alter her theory of liability by presenting evidence of earlier disagreements about financial or accounting entries. According to Miller's declaration, in January 2011, Miller recommended a correcting entry concerning MD's receipt of tax refunds of about $100,000 to her then supervisor, Noel Tripod. Tripod had discussed the matter with Acevedo, who refused to allow the entry. Tripod subsequently authorized the correcting entry. During a meeting on June 3, 2011, Miller thought Acevedo had accepted her analysis that the inventory of MD's Austria subsidiary was not overstated. On June 6, 2011, after a contrary entry was recorded by a colleague, Miller told Acevedo that she disagreed with it. Although Acevedo initially refused to correct the entry, he ultimately approved the correction.

"[N]ew factual issues presented in opposition to a motion for summary judgment should be considered if the controlling pleading, construed broadly, encompasses them. In making this determination, courts look to whether the new factual issues present different theories of recovery or rest on a fundamentally different factual basis." (*Laabs v. City of Victorville* (2008) 163 Cal.App.4th 1242, 1257.) A summary judgment or summary adjudication motion that is otherwise sufficient "cannot be successfully resisted by counterdeclarations which create immaterial factual conflicts outside the scope of the pleadings; counterdeclarations are no substitute for amended pleadings. [Citations.]" (*AARTS Productions, Inc. v. Crocker National Bank* (1986) 179 Cal.App.3d 1061, 1065.)

12

In this case, Miller attempted to present evidence of fundamentally different facts and a different theory to support her causes of action for wrongful retaliation and wrongful termination in violation of public policy. The first amended complaint broadly construed does not encompass the new factual issues that Miller presented in opposition to MD's motion. Accordingly, the trial court properly disregarded the evidence of her professional disagreements voiced in January and June of 2011 in analyzing whether MD's motion for summary judgment should be granted.

E. *Evidence on MD's Motion for Summary Judgment or Adjudication*

*Background*

Miller has been licensed as a Certified Public Accountant (CPA) in California since 1993. Miller was hired by MD, formerly known as MDS Analytical Technologies, as an assistant controller effective September 15, 2008. In January 2010, Danaher Corporation purchased MD. From 2008 until about January 2011, Miller held the position of assistant controller.

Julie Dull was employed by MD as the Director of Accounting from April 2009 to April 2010. During that period, Dull directly supervised Miller, whose duties included "the order to cash cycle (from the receipt of customer purchase orders through collection of invoices), general ledger close and related Sarbanes-Oxley requirements." Dull always found Miller's performance satisfactory but her one criticism was that Miller was willing "to go over [Dull's] head when [Dull] attempted to modify [Miller's] or her team's deliverables . . . ." During Dull's tenure, Miller's "performance in terms of delivery of work product and management of her subordinates was never an issue." Dull was terminated by Acevedo in approximately April 2010.

MD's personnel records reviewed by George Parker, MD's Vice President of Human Resources (VP of HR), indicate that Tripod supervised Miller from June 2010 through April 2011. Acevedo, supervised Miller after Tripod resigned in April 2011 through about mid-July 2011. Mohamed supervised Miller from about mid-July 2011

13

through December 13, 2011, the date of her termination.  Mohamed's immediate supervisor was Acevedo.

*Miller's Expanded Responsibilities*

Miller unsuccessfully applied for the position left vacant by Dull's departure. Miller did not advance past the first round of interviews.  The interview panel, which included Acevedo, generally thought that "Miller lacked sufficient knowledge of the business and details around cost accounting and revenue recognition" and she "needed more international experience to qualify for the position."  MD hired Tripod in June of 2010 to fill the position.

Acevedo explained the hiring decision to Miller and the need for her to acquire more experience.  Acevedo enlarged Miller's responsibilities to enable her to gain that experience.  In July or August of 2010, Miller's responsibilities expanded to include international consolidations, cost accounting, purchase accounting, and financial reporting.  Acevedo made Miller responsible for consolidations to gain some global experience, cost accounting to improve her understanding of gross margins, and an MD Brazil entity in order to "practice business partnering and ownership for a regional profit and loss statement."

In September 2010, Acevedo officially announced by e-mail that "Miller, Americas Regional Controller, will take on an expanded role that will include the cost accounting team and global consolidations in addition to general ledger accounting, credit and collections."  At that point, Raj Patel and Donna Huynh from cost accounting and Dan Luo from MD consolidations reported to Miller.

During approximately December of 2010, Miller joined Acevedo, at his request, on a business trip to Asia.  Miller claimed that Acevedo verbally offered her a future director position on that trip.  Miller received a performance bonus for her work in 2010.

14

*Miller's Position Identified as Probable "Top Grade"*

According to Acevedo, "[t]he 2010 year-end close did not go well for Miller's Molecular Devices finance group, and those failures exposed Miller's poor attention to detail." During the 2010 year-end close, "simple data errors were not being caught by Miller and her [finance] group, and were being caught in drafts reviewed by Tripod and [Acevedo]." Acevedo stated that those "errors should have been identified much earlier in the close process, and Miller's failure to catch them made the process more difficult and time consuming."

In Acevedo's view, "Miller struggled to grasp consolidations and cost accounting at the level required to manage her role and those of her subordinates." Acevedo stated that by February 2011, "data errors—ultimately [Miller's] responsibility—were increasing, and it was becoming clear that Miller did not seem to understand the business." Acevedo "received several complaints from members of the sales team that Miller did not know the product margins and was unresponsive to their requests for assistance." The sales team relies on the finance group for "metrics and margins on product."

In February 2011, Carroll, was part of a group conducting a talent assessment of MD's finance organization. The group rated and ranked individuals in MD's senior finance positions; Miller was given a low rating and identified as probable top grade.

A "top grade" classification calls for a change in position or termination. Employees identified for "top grade" are reassigned to a different organizational role in which they can be successful or removed from the organization, i.e., terminated. An employee's top grade classification does not, however, necessarily result in termination of employment.

*Proposed Reorganization of MD's Finance Organization*

Acevedo worked with Carroll on a proposed reorganization of MD's finance group. They met in early April 2011 and Acevedo proposed a reorganization of the

finance group as depicted in organizational charts. An organizational chart of the finance organization, entitled "MD Finance Org—March 2011," reflected the existing finance organization. The chart showed that Miller held the position of "Americas Controller" and reported to Tripod, the "Western Mkts Dir," who in turn reported to Acevedo. It indicated Miller had four direct reports: Janice Liu, Luo, Patel, and Huynh.

Organizational charts of the finance organization entitled "MD Finance Org—Post April" and "Controllership Finance Org—Post April" reflected Acevedo's proposed reorganization of the finance organization's reporting structure and the "top grade" classification of certain positions, including Miller's position. Carroll approved Acevedo's proposed reorganization. The charts depicting the proposed reorganization showed Miller still holding the position of Americas Controller but with only one direct report, Liu who was responsible for "GL/Payroll." The charts' coding indicates that the proposed reorganization would involve an "[u]pgrade [of] skills/fit" with respect to Miller.

*Acevedo Becomes Miller's Direct Supervisor*

According to Acevedo, Tripod told him that he "wanted to move the cost accounting responsibilities away from Miller" and Acevedo had "intended to give those responsibilities to Tripod" but Tripod resigned in April 2011. During Tripod's exit interview, Tripod indicated that Miller was "an inexperienced controller," Miller was not growing her skills as quickly as needed, lack of management skills was a problem in Miller's group, and, although Miller's group was competent in accounting, the group lacked support from Miller.

Miller directly reported to Acevedo during the search for Tripod's replacement. According to Acevedo, Miller's subordinates were complaining to him about her "lack of knowledge in cost accounting and her failure to give them needed direction on accounting issues." Acevedo stated: "They complained that she passed along to them requests she received from others for work product or information under her charge, but

16

did not provide any explanation or guidance when handing off the requests. They also complained that Miller lacked in-depth knowledge of certain process areas at the company."

By April 2011, Acevedo had "concluded that Miller was in the wrong position and should be terminated or placed in a different role, but with the turnover in the finance group, [he] decided to let her continue in the role for the time being." According to Acevedo, during a meeting of senior leadership in China in April of 2011, Edson Almeida, "the head of the Molecular Devices entity in Brazil," told Acevedo that "he felt Miller did not add value and that she could or would not make decisions on accounting issues, instead telling him she would get back to him later." Almeida had complained that Miller was unresponsive to his requests for assistance.

According to Acevedo's deposition testimony, Liu, Miller's subordinate, attempted to resign partly due to lack of direction from Miller but he persuaded Liu not to leave. Luo and Patel did leave MD. Acevedo attributed the turnover in the finance group to Miller's lack of leadership.

Miller submitted evidence from two subordinates, Huynh and Patel. Huynh stated in her declaration that Miller had a strong grasp of accounting principles. She described Miller as a "good manager." Huynh stated: "I never complained to . . . anyone at Molecular Devices or Danaher about [Miller], because I did not have a reason to complain about [Miller]." Patel, who resigned in May 2011, stated in his declaration that Miller was "an able and good manager, who worked very hard for the company" and she "possessed strong accountancy skills and competently performed her job as Controller." Patel also stated that he "had no complaints about [Miller] as a manager, and [he] did not hear of any complaints about her from other employees." Patel indicated that Acevedo did not have respect for the subordinates on his team and Patel quit because of Acevedo.

Sometime in May 2011, Miller submitted two requisition requests to HR "for help in [her] group," including one to permanently hire temporary employee Stephen Lee, but those requisitions were not acted upon.

*Further Developments Regarding Reorganization*

On May 17, 2011 Acevedo sent a confidential e-mail regarding the reorganization to several people, including Carroll and Parker. In the e-mail, Acevedo stated that he had heard unfavorable feedback concerning Miller's ability to support her current team members as a manager. He indicated that "next steps" included hiring a controller and an experienced cost accountant and moving Huynh under someone else's supervision. He also warned that Liu did not want to report to Miller. Acevedo's e-mail laid out a plan to make Miller "an individual contributor and focus on the audit, SOX planning/testing for MD and transitioning to the new Controller." The e-mail stated that her position "will be eliminated by the end of Q3 and absorbed by the Controller." Acevedo indicated that Miller would likely want to move on.

On June 9, 2011, Carroll memorialized MD's organizational review of its finance organization in a report entitled "2011 Organizational Review 'Lite'." The documents included various organizational charts, dated June 9, 2011, including a chart of the current and proposed finance organization. The chart depicting the current organization identified Miller's and Acevedo's positions as "topgrade (either internally or externally)."[7] The chart depicting the proposed organization did not include Miller.

Sometime in June 2011, Acevedo offered Miller "a role focused on identifying and implementing process improvements in the finance department," which she rejected. Acevedo thought that "the only option left was to terminate Miller," but he also believed that, due to "turnover in the [finance] group," MD "needed to keep her on board" until

---

[7] Acevedo remained employed by MD until late 2012.

18

others were found to fulfill her duties in the group. It was his determination in June 2011 that "Miller should eventually be terminated."

At some point, Acevedo also received complaints from Terry Booth and Hannes Kleineisen, who were part of the finance group in a newly acquired Austrian entity. According to Acevedo, "they no longer wanted to work with Miller because they could not get answers to their questions and because Miller did not seem to understand their business." "Booth asked for Flavia Campbell, a temp working in the department, to work with the Austrian entity."

Acevedo began documenting performance issues he observed. His notes indicate he had received some unfavorable feedback concerning Miller's work and, after becoming her direct manager in April 2011, he began coaching her. Acevedo recorded specific coaching examples in entries dated from June 20, 2011 to July 14, 2011.

*Miller's Accounting Concerns*

In her declaration, Miller states: "At the end of June 2011, [Acevedo] asked [her] to approve a 'true up' journal entry, for [MD's] subsidiary in Austria, to record a credit of approximately EUR176,000 . . . to 'Standard Cost of Goods Sold,' " but she believed that "the credit needed to be entered to 'Other Income,' not to COGS," and the accounting treatment she was asked to approve was "highly questionable, and deviated from GAAP and [MD's'] standard Purchase Accounting policies." Miller further states that, as to a $550,000 accounting discrepancy between the accounting system used by MD's Austria operation and the accounting system used by MD in the United States, she recommended to Acevedo that the discrepancy be moved "below the line" but Acevedo "insisted on accounting it 'above the line,' " which Miller believed was wrong.

In her declaration, Miller further indicated that Acevedo "insisted that approximately $180,000 be written off to Scrap in a Received Not Invoiced ('RNI') accounting entry," which she stated was "questionable under GAAP and company practices, which each require normally that such discrepancies be written off to Purchase

19

Price Variance." Miller also stated that, during a meeting on July 6, 2011, Acevedo told Carroll that "all Company procedures had been followed respecting the Excess & Obsolescence ('E&O') Reserve of the Company's Japan entity for the quarter," which she knew was untrue.

*In July 2011, Miller Complains to Carroll about Acevedo's Accounting Treatments*

According to Carroll, during a July 6, 2011 telephone call, Miller told him that she "wished to express general 'opposition' to changes in accounting processes by Acevedo" but described only one instance of disagreement concerning the appropriate "profit/loss line to use to record a journal entry." Miller understood that the entry should have been signed by the controller for that entity and she did not understand why she was asked to sign it. According to Carroll, Miller did not allege any violation of GAAP or law violation during that telephone call. According to Miller's declaration, during a July 6, 2011 telephone call, she complained about "the Austria inventory, the Austria journal entry, the RNI entry and [Acevedo's] misstatement about Japan's E&O Reserves."

Also on July 6, 2011, Carroll received an e-mail from Miller regarding E&O Reserve numbers for MD's Japan entity. According to Carroll, Miller never alleged that documentation regarding the Japan E&O Reserves reflected any violation of GAAP or any law.

Carroll received a further e-mail from Miller on July 6, 2011 with attached "documentation of invoices out of [MD's] Austria and Shanghai entities, and a related April 2011 Received Not Invoiced write-off of approximately $180,000 to a scrap account." According to Carroll, Miller never alleged that documentation regarding the $180,000 write-off reflected any violation of GAAP or any law.

According to her declaration, Miller forwarded e-mail strings and attachments to Carroll on July 6, 2011, July 7, 2011, July 11, 2011, and July 18, 2011 to support her accounting concerns.

20

Carroll reviewed Miller's complaints. He determined that a series of journal entries ultimately impacted the profit and loss statement of the entity but "entries amounted to immaterial accounting issues" even though "one could question which line of the profit and loss statement the entries should have hit." Carroll also concluded that Acevedo's instructions directing MD's Japan Controller to proceed with E&O "assessment for Japan in a manner different from" MD's "past practice" were "warranted and appropriate, and violated neither GAAP, nor any law." Carroll further determined that the approximate $180,000 write-off to a scrap account rather than a purchase price variance account was "appropriate under the circumstances, violated neither GAAP nor any law, and . . . was immaterial from both a GAAP and a gross margin standpoint."

*Mohamed Hired*

MD hired Mohamed and he began working as its Global Controller in approximately mid-July 2011. According to Acevedo, Mohamed was hired to assess his group with "a fresh set of eyes" and to "come to his own conclusions about the employees and organization under his supervision." Acevedo did not tell Mohamed about his previous conclusion that Miller should be terminated or any performance issues concerning her. Miller directly reported to Mohamed until her termination on December 13, 2011.

Mohamed stated that "[w]ithin the first few months of joining [MD], [he] observed that Miller was not meeting the expectations that the company had set for [her] position." He "first became concerned with Miller's performance shortly after [he] joined [MD], when Miller was tasked with completing a basic review of account mapping from Oracle to Hyperion for Cost of Goods Sold ('COGS') accounts." "Based upon [his] observations, [Mohamed] concluded Miller was unable to conduct the review due to her deficient understanding of what each COGS account related to, not due to a lack of training in Hyperion."

21

According to Miller's declaration, she was assigned "increasingly heavy, burdensome and less prestigious duties, while, at the same time, [her] ability to manage [her] support staff was undermined." She was not allowed to attend a training session on the use of the New Hyperion accounting system. She claimed that she well understood the COGS accounts but "the account mapping could not be completed without training on the Hyperion account mapping, accounts roll-ups, account set-ups, and methodology."

Mohamed began to contemporaneously record his observations of Miller's performance in a log. The first entry is dated July 27, 2011.

During an August 2, 2011 meeting between Mohamed, Miller and Acevedo, they "discussed the consolidation of worldwide financial reports" and it became clear to Mohamed that Miller did not understand consolidations. After the meeting, Mohamed discussed his concern about Miller with Acevedo. Acevedo shared that he had "noted some of the same concerns." Prior to that conversation, no one at either MD or Danaher had provided any information on Miller's past performance to him. Acevedo told Mohamed that "he was responsible for managing the performance of the group."

*Michael Wells' Perceptions of Miller and Acevedo*

Michael Wells worked with MD as interim controller for three months ending in August of 2011. During that time, Wells worked in the office next to Miller's office and he worked closely with Miller in "closing and special issues." He "always found her technical accounting skills were good and her dedication to the company exemplary." Wells concluded that Acevedo "lacked strong accounting knowledge" since Wells "had to constantly explain the accounting issues [that Wells] worked on to [Acevedo]."

*September, October, and November 2011*

In an e-mail dated September 1, 2011 to Carroll, Colin Davis, Carroll's functional supervisor, asked whether Miller's termination had been resolved yet and indicated that he would appreciate a "fast response" because he had "a compliance update call shortly." One of the options identified in the various organizational reviews had been the

22

elimination of Miller's position. As far as Carroll knew at that point, however, Miller was still "a potential individual contributor."

In response to Davis's e-mail, Carroll e-mailed Acevedo and Parker with the following questions: "How shall I respond? [¶] Is her severance included in the Wish List?" Acevedo responded to Carroll's inquiries and, in an e-mail dated September 1, 2011, Carroll sent the following message to Davis: "Her severance is part of the wish list. [¶] She is a minority female associate who has expressed concern that she is being passed over for promotion so documenting performance heavily. Intent is to notify and terminate in Q4."

Mohamed had also received complaints from Almeida, the head of the Brazil entity, about the lack of support Almeida felt he was receiving from Miller. Mohamed decided to "move Miller's consolidations and accounting support for Brazil duties to another employee" because he "concluded that Miller lacked the ability and/or time to handle those [Brazil] duties." Mohamed hired Campbell, to handle consolidations and support of Brazil. Before accepting the position, Campbell, who had been a contractor with the company, told Mohamed that she felt Miller was an incompetent manager and refused to work for her. Mohamed allowed Campbell to report to him.

According to Mohamed, two other subordinates in Miller's finance group had complained to him about Miller's inadequate guidance or management. Liu told Mohamed that part of the reason for her wish to resign was that "Miller often delegated her own duties to Liu without giving appropriate guidance." Mohamed said the Huynh had "similar complaints about Miller's management of the team . . . ." Huynh specifically stated in her declaration, however, that she never complained about Miller to Mohamed.

A document, entitled "2011 Organization Review" and dated October 11, 2011, which contained organizational charts of MD's current and proposed finance

organization, showed Miller's position identified as "top grade (either internally or externally)." It also showed Acevedo's position identified as top grade.

Mohamed's log indicates that Miller was not timely completing a number of assignments in September, October, and November 2011. A November 1, 2011 entry in Mohamed's log indicates that Mohamed and Miller agreed to speak on November 2, 2011 regarding her goals.

*Miller's Complaint Filed on November 17, 2011*

Carroll never told Acevedo or Mohamed that Miller had contacted him regarding a journal entry issue or that Miller had sent him an e-mail on the Japan E&O Reserve issue. Carroll never shared with Acevedo or Mohamed that he had discussed the $180,000 write-off with Miller, or that Miller voiced any concern about the write-off to him. Acevedo had never spoken to Carroll about concerns Miller may have had about his accounting recommendations. Mohamed had not been told that Miller had expressed concerns over any accounting issues or treatments at MD.

According to Acevedo, Miller had never informed him that she thought any accounting treatment that he had approved violated any law or GAAP. Until October 2011, when Parker asked Acevedo some questions about the finance group, Acevedo was unaware that Miller had questioned his recommended accounting treatment. Based on Parker's inquiries, Acevedo surmised that perhaps Miller was questioning something he had approved.

On November 17, 2011, Miller filed her original complaint for wrongful retaliation in violation of public policy. It alleged that at the close of June 2011, Acevedo pressured her to approve an improper "true up" journal entry, which deviated from the GAAP and from the "Company's standard Purchase Accounting policies." It was also alleged that Acevedo had insisted that approximately $180,000 be written off to scrap in a "Received Not Invoiced" entry, which was an improper accounting treatment "under GAAP and Company practices." It was further alleged that Acevedo made "inaccurate

24

and untruthful" comments to Carroll during a July 6, 2011 meeting when he said that "all Company procedures had been followed respecting the Excess & Obsolescence ('E&O') Reserve of the Company's Japan entity for the quarter." The complaint indicated that she brought "Acevedo's repeated deviations from ethical practices" to the attention of Carroll, Acevedo's superior, "verbally and in emails to Mr. Carroll during the first two weeks of July 2011." It alleged that defendants retaliated against her "in her employment for objecting to and shining a light on . . . improper accounting treatments."

In November 2011, Acevedo discovered that Miller had filed a complaint; he received a copy around Thanksgiving time and read it. Mohamed learned for the first time of Miller's accounting concerns when he was told that she had filed a lawsuit against MD.

*Miller's Request for Time Off*

Mohamed had been at MD for less than six months when Miller asked for time off from December 26 to December 30, 2011. It was Mohamed's "first year-end close of [MD's] financial reporting obligations" so he felt he "needed to have as many people as possible available in Sunnyvale, particularly those who, like Miller, had prior experience conducting the process at Molecular Devices." Since Miller had granted a vacation request to a subordinate during the same time period, Mohamed was already "down one employee." Mohamed was scheduled to visit MD's Brazil's entity during the same period and Mohamed was "concerned about the lack of management presence in the office if Miller were to leave for vacation." For all the foregoing reasons, he denied Miller's request.

An e-mail from Miller to Mohamed, dated November 18, 2011, stated that she went to Chicago every year to visit her parents. She asked for an explanation of Mohamed's rejection of her December time-off request. In his log concerning Miller, Mohamed wrote a November 21, 2011 entry stating that Miller mentioned that she intended to go on vacation during the week of December 26 to visit her father even

25

though Mohamed had not approved of her time off. At that time, Mohamed did not know that Miller's father had medical issues. That entry indicates that Mohamed reminded Miller that "the E&O and standards revision . . . requires her team's full focus." At the time he wrote that entry, Mohamed believed it was "crucial that senior members of the team not be on vacation during this E&O and standards revision period."

In an e-mail from Miller to Mohamed, dated November 22, 2011, regarding the denial of her time-off request, Miller asserted that her absence would not affect the "close of books." In an e-mail response to Miller, also dated November 22, 2011, Mohamed stated in part: "Your presence and guidance to help with the standards revision and ensuring that we are ready on other fronts for the year end is vital. I am scheduled to be in Brazil the week of Dec 26 for a financial review and we need as many hands on deck in order to ensure we close as best as possible. [¶] I have approved all of your time off to date which amounts to more than 3 weeks since July 2011. Given the circumstances, I am unable to approve your time off."

In an e-mail from Miller to Mohamed, dated November 27, 2011, Miller complained that "[i]t seems unreasonable that there is no scenario available that would allow me to take this time off for the week of December 25, 2011 . . . ." She asserted: "Since I have been part of Molecular I have taken this week off to visit my family in Chicago without any problems occurring." She also stated: "Please let me know when you have discussed this with Albert."

A November 28, 2011 entry in Mohamed's log states that he discussed with Miller that he "could not approve her time off given it was not just about cost accounting work that needs her guidance but also given it's the year end close, there could be things coming up where we will need her help."

*Early December of 2011*

On December 2, 2011, Mohamed met with Miller, Acevedo, and a consultant, Michelle Hammond, to review issues arising during Sarbanes-Oxley testing that took

26

place during the summer of 2011. During the meeting Mohamed learned that Miller consistently failed to flag major mistakes with deferred revenue and lacked sufficient understanding of deferred revenue and revenue recognition for non-standard contracts. He also learned that Miller lacked familiarity with the nature and timing of MD's service agreements and the appropriate accounting for those agreements.

Mohamed's December 5, 2011 entry in his log regarding Miller's performance recorded that Huynh asked him whether Miller was coming in that day and she remarked that "the cost accounting team really needed [Miller's] guidance" since she had "not been available very much to them and they feel frustrated." Although Huynh denied in her declaration feeling frustrated about Miller's unavailability and making any comment about Miller on December 5, 2011, she acknowledged that she asked Mohamed whether Miller would be coming in that day.

*More Communications Regarding the Denial of Miller's Time Off Request*

An e-mail from Miller to Mohamed, dated December 5, 2011, asks, "Did you have a chance to talk to Al regarding my vacation time for Dec' 11? If yes, is it ok if I take this time off?" Mohamed asked Acevedo for advice regarding Miller's request for time-off and Acevedo told him it was "his decision to make" and offered no opinion.

In her declaration, Miller claims that Mohamed and she met during the first week in December 2011, no later than December 7, 2011, and she "specified [that she] wished to go to Chicago to care for [her] father, who was very ill, and help with his post-cancer follow-up medical appointment." An entry in Mohamed's log, dated December 7, 2011, states that Miller asked him for the fourth time in three weeks whether he would change his mind regarding her vacation request for the last week in December. According to Mohamed's notes, he indicated that he would not reconsider Miller's request because she had already taken more than four weeks of vacation since July, it was "year end," and there were "quite a number of open items."

27

The last entry in Mohamed's log is dated December 12, 2011.  Nothing in his log suggests that he understood Miller's request for time-off as a request for leave pursuant to the CFRA or the FMLA.  Mohamed does note in his log her many absences, apparently for various reported reasons including Miller not feeling well, medical appointments, children's appointments, a child's illness, and lack of a babysitter.

*Mohamed's Determination that He Needed to Terminate Miller*

Nothing in Mohamed's log indicates that there was a plan in place, either tentative or definite, to terminate Miller.  Mohamed could not recall exactly when he decided that he "would need to terminate Miller" but he was certain that he reached that conclusion before Miller "changed her vacation request into a request for medical leave."  According to his declaration, Mohamed discussed with Acevedo his intention to terminate Miller's employment prior to any request for CFRA leave.  In those conversations, Acevedo consistently told Mohamed that decisions about Miller and his other direct reports were up to him.  According to Acevedo, Mohamed independently made the decision to terminate Miller in December 2011.  Mohamed recommended to Acevedo and Parker (MD's VP of HR), that MD "terminate Miller's employment as the result of her significant performance deficiencies . . . ."

*Termination Paperwork*

In his declaration, Parker stated that he was certain that Mohamed informed him of his (Mohamed's) decision to terminate Miller before December 9, 2011.  In an e-mail to Michelle LaRoche and Karen Frechou, dated Friday December 9, 2011, Parker stated that it "[l]ooks like we are moving toward[] a Monday afternoon termination of [Miller] pending a report-out this afternoon on some issues from [Mohamed]" and indicated that Parker and Mohamed would have "another conference call Monday with PK to finalize."  Parker asked them to "start pulling together the paperwork."

On the morning of December 12, 2011, Frechou e-mailed the termination paperwork for Miller to Parker.  The prepared paperwork included a typed letter from

Parker to Miller, dated December 12, 2011, which stated in part: "As you have been informed, Molecular Devices is eliminating your job position as a result of our decision to restructure and refocus our approach to conducting business. This letter will confirm the termination of your employment with Molecular Devices. Your last date of employment will be December 12, 2011. You will receive pay through December 31, 2011 in lieu of notice."

*Invocation of the CFRA and the FMLA*

In an e-mail that appears to have been sent at about 7:26 p.m. on December 12, 2011 from Miller to Mohamed, Miller asked Mohamed to reconsider his rejection of her time-off request. She stated: "[A]s Albert knows, my father has an ongoing medical condition and I take this time of year to help with his care. In 2010 after my Dad became seriously ill and underwent prostate surgery and lost sight out of one eye, this visit has become more critical for my parents. My Dad has a Doctor's appointment scheduled on December 27, 2011 that was planned so that I could take him there. My parents rely on me to help them understand the Doctor's recommendations and treatment plan. I believe as an employee I have a right to take leave time for family medical care under the federal Family Medical Leave Act and the California Family Rights Act." She gave her reasons for disagreeing with Mohamed's decision.

In his declaration, Mohamed stated that "[i]t was not until December 12, 2011, when Miller sent [him] an email raising for the first time the federal [FMLA] and the [CFRA], that [he] realized that Miller was changing her request for time off from a standard vacation request to a request for statutory leave." In deposition testimony, Miller acknowledged that her December 12, 2011 e-mail was probably the first e-mail in which she mentioned the FMLA or the CFRA. She also indicated that, during past years, she did not ask for FMLA or CRFA leave to visit her parents in December because her vacation requests were approved. In deposition testimony, Miller indicated that she was

29

not aware that requests for family medical leave were required by policy to be submitted 30 days in advance of leave.

The following morning, Mohamed forwarded Miller's December 12, 2011 e-mail to Acevedo and Acevedo then sent an e-mail to Parker indicating that he supported Mohamed's decision not to approve Miller's time-off request and gave his reasons. Acevedo stated that he had "fully empowered [his] Global Controller to manage his team."

Sometime after Miller's December 12, 2011 e-mail to Mohamed, Mohamed spoke with Acevedo and Parker in person about her request for medical leave. Mohamed told Acevedo that Miller had applied for FMLA leave and he was "not going to stop her from going to see her father." Although Acevedo had approved Miller's request to take vacation in December 2010 to care for her father who had a serious medical condition, Acevedo did not know her father's state of health in 2011. With respect to whether or not to grant family medical leave to Miller, Acevedo told Mohamed that it was Mohamed's decision. Mohamed replied that it was "not up to him anymore" because it was "an FMLA matter" and she had "to go."

In an e-mail from Mohamed to Miller, which indicated it was sent at about 2:09 p.m. on December 13, 2011, Mohamed stated: "You never submitted a request to me and never told me that you submitted a request to HR for leave under the FMLA or the CA Family Rights Act. Obviously, there is a process and paperwork to be submitted to have such leave approved." He indicated that Miller had framed her request as a vacation request. Mohamed clarified that Acevedo had nothing to do with his decision to deny Miller's vacation request and explained that his decision had been based on his "view of the business needs and requirements." He stated, among other things, "As a senior manager in the team, I do expect that you will not only ensure tasks under your responsibilities are taken care of but to also lend a hand to the team as a whole.

30

I distinctively remember repeating the phrase on multiple occasions 'I need as many hands on deck' given it is the year end."

In deposition testimony, Mohamed indicated that, when he wrote that e-mail, he continued to believe that they needed all the help they could get for the year-end close, which included Miller's help.

*Mohamed's Final Decision to Terminate Miller*

Mohamed was asked during his deposition, "Who made the decision to fire [Miller] on December 13, 2013?" He replied, "I did." Mohamed was then asked, "[W]as that decision made on December 13th or before?" He could not recall. When asked whether it was fair to infer that he had not reached the conclusion to terminate Miller when he wrote the December 13, 2013 e-mail, Mohamed answered, "I don't recall when I came to that conclusion." When asked what prompted him to decide to fire Miller after telling her in his e-mail, dated December 13, 2011 at 2:09 p.m., that he "needed as many hands on deck" as possible, Mohamed stated that his decision was prompted by her record of performance issues.

HR "revised the separation agreement and general release previously prepared for Miller to reflect" a termination date of December 13, 2011. On the afternoon of December 13, 2011, Parker and Mohamed met with Miller in a conference room and Mohamed informed Miller that she was terminated. Parker provided Miller "with the termination paperwork Human Resources previously prepared for her." Parker assisted Mohamed in conducting Miller's termination but he did not make the decision to terminate her employment.

According to Acevedo, although he "had determined that Miller should eventually be terminated in June of 2011, the decision to terminate Miller in December of 2011, was made independently by" Mohamed. Acevedo agreed, however, with Mohamed's decision to terminate Miller.

While there was evidence that it was the standard practice at MD to put an employee on a performance improvement plan (PIP) if the employee's performance was not meeting expectations, Miller was never placed on a PIP prior to her termination on December 13, 2011.  Like Miller, Acevedo was never put on a PIP before leaving MD.  According to Miller's declaration, Acevedo did not communicate any concerns about her performance in 2010 or 2011 and Mohamed did not tell her about complaints concerning her from Campbell, Liu, or Huynh.

F.  *Evidentiary Objections*

1.  *Standard of Review*

Although the California Supreme Court has declined to "decide generally whether a trial court's rulings on evidentiary objections based on papers alone in summary judgment proceedings are reviewed for abuse of discretion or reviewed de novo" (*Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 535), the weight of appellate authority indicates that courts deferentially review a trial court's evidentiary rulings in summary judgment proceedings for abuse of discretion.  (See *Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 852; *Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 255 [assuming without deciding that the abuse of discretion standard applies to review of evidentiary rulings]; *Carnes v. Superior Court* (2005) 126 Cal.App.4th 688, 694.)  On appeal, the burden is not on respondents to show the court's evidentiary rulings were correct.  (See *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.)  The burden is on the party challenging a trial court's evidentiary ruling to establish that the court abused its discretion and appellate courts find such abuse only if the ruling exceeds the bounds of reason.  (*DiCola v. White Brothers Performance Products, Inc.* (2008) 158 Cal.App.4th 666, 679; see *Denham v. Superior Court, supra*, 2 Cal.3d at p. 566 [" '[D]iscretion is abused whenever, in its exercise, the court exceeds the bounds of reason, all of the circumstances before it being considered. . . .' [Citations.]"].)  But discretion "must be

exercised within the limits the law permits." (*Sargon Enterprises*, *Inc*. *v*. *University of Southern California* (2012) 55 Cal.4th 747, 773.)

2. *Miller's Overruled Evidentiary Objections*

a. *Acevedo's Statements*

*Interview Panel's Feelings* (*Objection No. 2*)

Acevedo stated in his declaration that after Dull (Miller's former supervisor) left MD, a panel of individuals, which included Acevedo, interviewed potential replacements. Acevedo further stated: "Miller interviewed for the position, but did not advance past the first round of interviews. Generally speaking, the panel felt that Miller lacked sufficient knowledge of the business and details around cost accounting and revenue recognition. The panel also felt that Miller needed more international experience to qualify for the position." He also stated that Tripod was hired for the position in June 2010 and became Miller's direct supervisor.

Miller objected to Acevedo's statements regarding the other members' feelings on a number of grounds, including lack of foundation and hearsay. In her objection, she stated that "Acevedo's testimony lacks foundation to support the opinion evidence proffered" and to "establish that the panel that analyzed Miller's candidacy had knowledge of her skills and performance history, and those of the other applicants, to establish sufficient knowledge to score and rank the applicants." She also asserted that Acevedo was "testifying to the alleged statements/'feelings' of [the] others that occurred in meetings."

On appeal, Miller has not presented legal argument and authority in support of her lack of foundation and hearsay claims. Accordingly, we treat them as waived. (See *Stanley*, *supra*, 10 Cal.4th at p. 793 [" '[E]very brief should contain a legal argument with citation of authorities on the points made. If none is furnished on a particular point, the court may treat it as waived, and pass it without consideration. [Citations.]' [Citations.]"].)

Moreover, it may be reasonably inferred from Acevedo's declaration that Acevedo was referring to views generally expressed by members of the interview panel, which he personally heard since he was a member, regarding Miller's qualifications for the supervisorial position. In addition, the evidence was admissible for the nonhearsay purposes of showing panel members voiced general concerns regarding the adequacy of Miller's qualifications for the position and explaining the reason for Acevedo's subsequent actions pertaining to Miller. (See Evid. Code, § 1200, subd. (a)[8]; see also Evid. Code, §§ 210 ["relevant evidence" defined], 351 [admissibility of relevant evidence].)

In his declaration, Acevedo stated that he "met with Miller to discuss her candidacy and explain why she had not been hired for the position" and "explained that she needed more experience . . . ." Acevedo indicated that he subsequently gave her "some responsibilities to provide her with that experience" and, specifically, he "gave her responsibility for consolidations to gain some global experience, cost accounting to improve her understanding of gross margins, and responsibility for Brazil, so she could practice business partnering and ownership for a regional profit and loss statement."

*Talent Assessment* (*Objection No. 13*)

In his declaration, Acevedo indicated that, subsequent to the 2010 year-end close, the MD finance group "underwent a talent assessment to rank employees and reorganize the group" and "Miller was given a low rating in this process . . . ." He further stated that, in February or March of 2011, Miller was "identified for 'top grading,' which called for a position change or termination."

---

[8] " 'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).)

In the court below, Miller objected to the Acevedo's statements concerning her low rating and "top grade" classification on hearsay grounds, stating that "Acevedo appears to be referring to a document, or to a rating given by someone else, and . . . this constitutes hearsay." She also asserted that there was insufficient foundation because Acevedo failed "to show that a 'low rating' was given, and fails to explain the basis for 'top grading.' "

On appeal, Miller has not presented legal argument and authority in support of her lack of foundation and hearsay claims. Accordingly, we treat her contentions as waived. (See *Stanley*, *supra*, 10 Cal.4th at p. 793.)

Furthermore, given the evidence that Acevedo was the MD's VP of Finance and supervised Tripod, Miller's immediate supervisor, it may be reasonably inferred that he personally knew a talent assessment of the finance organization had been conducted in early 2011 and its results with respect to Miller. As to her hearsay objection, Acevedo's statements were admissible for the nonhearsay purpose of showing the information upon which Acevedo was relying in making reorganization proposals regarding the finance group, including Miller's position. (See Evid. Code, § 1200, subd. (a); see also Evid. Code, §§ 210, 351, 355; cf. *Wolff v. Brown* (8th Cir. 1997) 128 F.3d 682, 685 ["In employment discrimination cases, internal documents relied upon by the employer in making an employment decision are not hearsay as that term is defined in Fed. R. Evid. 801(c)—statements offered to prove the truth of the matters asserted. Rather, such documents are relevant and admissible because they help explain (or may help explain) the employer's conduct. [Citations.]"].)

b. *Complaints about Miller* (*Objection Nos. 5-7, 9, 15, 22, 25*)

On appeal, Miller asserts that alleged complaints about her by her subordinates or MD's affiliates in Brazil and Austria, which were recounted by Acevedo or Mohamed, were "classic hearsay" and were "for the most part so vague and conclusory as to the foundational setting and substance of the supposed complaints as to be inadmissible."

35

Miller has not presented legal argument and authority in support of those broad contentions or specifically shown by legal argument and citation to authority that the court abused its discretion in overruling her particular objections to the specific statements at issue.  Accordingly, we treat her contentions as waived.  (See *Stanley*, *supra*, 10 Cal.4th at p. 793.)

Furthermore, evidence that Acevedo or Mohamed received complaints about Miller was admissible for the nonhearsay purpose of showing information received and considered by them in assessing her performance.  (See Evid. Code, § 1200, subd. (a); see also Evid. Code, §§ 210, 351.)  Comments about an employee that were received and considered by the employee's supervisor before taking adverse employment action against an employee are not hearsay insofar as they are not offered for their truth but are offered to merely show information considered in making an employment decision.  (See Evid. Code, § 1200, subd. (a); cf. *Maday v. Public Libraries of Saginaw* (6th Cir. 2007) 480 F.3d 815, 819-820; *Garner v. Missouri Dept. of Mental Health* (8th Cir. 2006) 439 F.3d 958, 960.)

c.  *Miller's Performance* (*Objection Nos. 3-5, 10-12, 19-21*)

Miller objected to evidence of Acevedo's and Mohamed's observations or assessments of her performance.  On appeal, Miller contends that Acevedo's and Mohamed's "performance logs" were "rife with vague, conclusory and unsubstantiated hearsay."  She maintains that their assessment of her work performance were "inadmissably vague, conclusory and often speculative both as to foundational setting and substance."  On appeal, Miller has not presented legal argument and authority in support of those broad contentions or specifically shown by legal argument and citation to authority that the court abused its discretion in overruling her particular objections to the specific statements at issue.  Accordingly, we treat her contentions as waived.  (See *Stanley*, *supra*, 10 Cal.4th at p. 793.)

36

Moreover, Acevedo's and Mohamed's beliefs regarding Miller's performance at various times and their logs concerning Miller were admissible for the nonhearsay purposes of showing that they were documenting observations and concerns regarding her performance. (See Evid. Code, § 1200, subd. (a); see also Evid. Code, §§ 210, 351; cf. *Moore v. Sears, Roebuck & Co.* (11th Cir.1982) 683 F.2d 1321, 1322-1323, fn. 4 [supervisors' memoranda recording observations pertaining to employee's performance over a period of months did not constitute hearsay because evidence offered to establish that employer was motivated to discharge employee for reasons other than age and not to prove that the employer correctly assessed employee's performance].)

d. *Carroll's Declaration* (*Objection Nos. 33-35*)

Miller now challenges the trial court's overruling of her objections to several statements in the declaration of Carroll. Carroll indicated that, based on the data and information provided by Miller and his decades of experience and training in finance and accounting, he determined that matters raised by Miller in her complaints to him did not demonstrate that Acevedo's accounting practices were improper.

On appeal, Miller argues that Carroll's assessments of her work are "vague and conclusory, dependent on hearsay, and consisting of unsubstantiated opinion lacking in foundation, particularly since Carroll is not a CPA entitled to offer opinions as to what meets or violates GAAP standards." Miller has not presented legal argument and authority in support of those broad contentions or specifically shown by legal argument and citation to authority that the court abused its discretion in overruling her particular objections to the specific statements at issue. Accordingly, we treat her contentions as waived. (See *Stanley*, *supra*, 10 Cal.4th at p. 793.)

3. *Defendants' Sustained Evidentiary Objections*

a. *Dull's Declaration* (*Objection Nos. 63-64, 66-67*)

Miller asserts that Dull, a past supervisor, had "a sufficiently foundational personal knowledge of company expectations and standards, and responsibility for

37

evaluating Miller's skills and performance, to support her view that, contrary to Acevedo's and Mohamed's claims, Miller's work performance was entirely satisfactory." (Fn. omitted.) Dull's declaration states she was employed by MD from April 2009 to April 2010 and she was Miller's direct supervisor during that entire time. Miller has not presented legal argument and authority in support of her broad contentions or specifically shown by legal argument and citation to authority that the court abused its discretion in overruling defendants' particular objections to the specific statements at issue. Accordingly, we treat her contentions as waived. (See *Stanley*, *supra*, 10 Cal.4th at p. 793.)

Moreover, it appears that the court's rulings on those objections were correct. Dull stated that "Miller was never so downgraded in the talent assessment in which I participated, nor had anyone made negative comments about her abilities or performance." The court correctly sustained the relevancy objection to that statement (objection No. 63). The evidence showed that Miller's responsibilities significantly expanded after Dull left MD in April 2010 and the "talent assessment" was conducted in early 2011. Dull's statement was not relevant to prove that MD did not conduct a talent assessment and classify Miller's position as "top grade" in 2011 or Miller's subsequent supervisors did not receive complaints about her and did not genuinely believe that her performance was deficient. (See Evid. Code, §§ 210, 350.)

In her declaration, Dull indicated that, while she was Miller's direct supervisor, Miller interacted with MD's sales team only to review purchase orders and calculation of commissions. Dull stated: "There would have been no other reason of which I am aware that [Miller] would have had interaction with sales. Of course there could have been additional duties of which I am not aware that were assigned to her after my departure." The court correctly sustained the objections to those statements (objection No. 64) since they were irrelevant to the issues on summary judgment (see Evid. Code, §§ 210, 350)

and Dull clearly lacked personal knowledge of Miller's responsibilities under subsequent supervisors. (See Evid. Code, §§ 403, subd. (a)(2); 702, subd. (a).)

Dull indicated that, when Miller and she spoke while Miller was still an employee, Miller was very concerned that a journal entry "was not in accordance with Danaher policy" and Acevedo "had misrepresented it to Danaher personnel in her presence." Dull stated that Miller "was shocked and confused by the obvious lie." The trial court properly found those statements inadmissible (objection No. 66) since Dull lacked personal knowledge of what entry had been made and what Acevedo had said and Dull's personal lay opinion about Miller's feelings was in inadmissible. (See Evid. Code, §§ 403, subd. (a)(2), 702, subd. (a), 800.)

After praising Miller in her declaration, Dull stated: "Therefore, *without knowing the specifics of the issue*, I finding it difficult to believe that [Miller] could have made any serious errors on anything unless she was not provided adequate training." (Italics added.) The trial court correctly sustained the objections to that statement (objection No. 67). Dull admittedly lacked personal knowledge of "the specifics" (see Evid. Code, §§ 403, subd. (a)(2), 702, subd. (a)) and her personal belief about Miller was irrelevant. (See Evid. Code, §§ 210, 350.)

b. *Subordinates' Declarations* (*Objection Nos. 6-8*, *74*, *77-78*, *81-83*)[9]

Miller maintains that her subordinates, Patel and Huynh, had "sufficiently foundational personal knowledge" to permit Patel to testify that Miller's skills and performance were satisfactory, but he had problems with Acevedo's skills and Huynh to state "who did what projects," whether the accounting team was short-handed at the 2011 year-end close, and whether Mohamed had authority to ask Huynh not to take her vacation at that time. Miller has not presented legal argument and authority in support of

---

[9] Although Miller's opening brief indicates she is challenging the trial court's ruling on objection No. 82, the court actually overruled the objections under that heading.

those broad contentions or specifically shown by legal argument and citation to authority that the court abused its discretion in sustaining defendants' particular objections to the specific statements at issue. Accordingly, we treat her contentions as waived. (See *Stanley*, *supra*, 10 Cal.4th at p. 793.)

Moreover, Huynh's lay opinions about the genuineness of Mohamed's beliefs concerning staffing needs during the 2011 year end were inadmissible.[10] In addition, lack of personal knowledge was not the only evidentiary objection interposed by defendants with respect to the specific statements at issue and Miller fails to show that those statements were admissible over all the objections.

c. *Miller's Declaration* (*Objection Nos*. 24, 26, 30-33, 36, 39-42, and 44)

With respect to objection Nos. 30-33, 36, 40-42, and 44, Miller maintains that the "lack of foundational personal knowledge" as to her statements concerning "her own acts, judgments of GAAP violations," her "experiences within the company," and "company actions and operations" was "frivolous" in light of her "senior rank, operational duties, and company tenure." With respect to objection Nos. 24, 26, 41,

---

[10] A witness may not testify concerning a particular matter unless the witness has personal knowledge of the matter. (Evid. Code, § 702, subd. (a).) " 'Personal knowledge' means a present recollection of an impression derived from the exercise of the witness' own senses. 2 Wigmore, Evidence § 657 at 762 (3d ed. 1940)." (Cal. Law Revision Com. com., 29B pt. 2 West's Ann. Evid. Code (1995 ed.) foll. § 702, p. 300 (rev. 3/14).) "A lay witness may express an opinion based on his or her *perception*, but only where helpful to a clear understanding of the witness's testimony (Evid.Code, § 800, subd. (b)), 'i.e., where the concrete observations on which the opinion is based cannot otherwise be conveyed.' (*People v. Melton* (1988) 44 Cal.3d 713, 744.)" (*People v. Hinton* (2006) 37 Cal.4th 839, 889, italics added.) "Neither a lay witness nor an expert witness may be asked a question that calls for an answer based on conjecture or speculation." (1 Jefferson's Cal. Evidence Benchbook (Cont.Ed.Bar 4th ed. 2014) Method and Scope of Examination of Witnesses, § 28.56, p. 28-35.) Testimony based on speculation and conjecture is "irrelevant" "because it does not have a tendency in reason to prove or disprove the disputed issue on which the testimony is proffered. [Citations.]" (*Ibid*.)

Miller argues that the hearsay objections to her statements insofar as they related Acevedo's and Mohamed's statements were frivolous. With respect to objection Nos. 31 and 36, Miller contends that defendants' objections on the ground of lack authentication to e-mail evidence was frivolous.

Miller has not presented legal argument and authority in support of those broad contentions or specifically shown by legal argument and citation to authority that the court abused its discretion in overruling defendants' particular objections to the specific statements at issue. Although Miller mentions various hearsay exceptions (Evid. Code, §§ 1222 [authorized admission], 1224 [statement of declarant whose liability, obligation, or duty is at issue], 1230 [declaration against interest]) and proclaims they generally apply to Acevedo's statements, she provides no analysis whatsoever with regard to the particular statements to which defendants' objected. Accordingly, we treat Miller's contentions as waived. (See *Stanley*, *supra*, 10 Cal.4th at p. 793.)

Moreover, many of Miller's statements to which objections were sustained are clearly objectionable as speculative or impermissible lay opinion and thus are inadmissible under Evidence Code section 702 or 800. (See fn. 10, *ante*.) With respect to objection Nos. 33, 36, and 39, Miller argues that her statements relating "statements by the European and Austrian controllers, Eva Quinonez, and Mike Wells are also not even hearsay, and thus admissible, to the extent they show the basis of Miller's confidence in her own judgments that Acevedo, and thus the company, was engaged in GAAP violations." Miller has not shown that she sought to admit those statements for nonhearsay purposes or those statements have any relevancy if limited to such purposes.

Further, defendants raised multiple objections to the above evidence and Miller fails to show that the specific statements at issue were admissible over all the objections.

4. *Conclusion*

Based on Miller's appellate contentions concerning the trial court's evidentiary rulings, we cannot conclude that this court should consider evidence found inadmissible

41

by the trial court or should disregard evidence found admissible by the trial court in our de novo review of MD's motion for summary judgment.

G. *Triable Issues of Material Fact Remain*

1. *Background*

MD's motion for summary judgment was based on its assertion that the decision to take adverse employment action, including termination, against Miller was made prior to any protected activity. The trial court agreed that the evidence showed that the adverse employment decision was reached no later than June 2011 and, therefore, all of Miller's claims fail.

On appeal, Miller maintains that the evidence is sufficient to establish a causal link between her protected complaints concerning accounting improprieties and a number of adverse employment actions and to support an inference of retaliation. She argues that the evidence was sufficient to show that Acevedo was "behind the decision to fire her either directly or later through Mohamed."[11] She also contends that a rational jury could find that a protected leave request preceded the termination decision and the evidence supports an inference of retaliation.

---

[11] Miller has not explicitly relied upon a "cat's paw" theory of retaliation. Under a cat's paw theory, the ultimate decision maker is the instrument (cat's paw) of an actor with discriminatory or retaliatory motive. (See *Reeves v. Safeway Stores, Inc.* (2004) 121 Cal.App.4th 95, 113-115 (*Reeves*); see also *Staub v. Proctor Hosp.* (2011) 562 U.S. 411, 419-420, 422.) "To establish an entitlement to judgment as a matter of law, it is not enough to show that one actor acted for lawful reasons when that actor may be found to have operated as a mere instrumentality or conduit for others who acted out of discriminatory or retaliatory animus, and whose actions were a but-for cause of the challenged employment action." (*Reeves*, *supra*, at p. 113.) A "plaintiff can establish the element of causation by showing that *any* of the persons involved in bringing about the adverse action held the requisite [retaliatory] animus, provided that such person's animus operated as a 'but-for' cause, i.e., a force without which the adverse action would not have happened." (*Id*. at p. 108.) On appeal, Miller does not point to evidence from which a reasonable trier of fact could infer that Acevedo harbored retaliatory animus that was the "but-for" cause of a decision by Mohamed to terminate her.

42

Although Miller cannot now argue that her professional disagreements with colleagues in January and June of 2011 constituted protected activity since such theory is outside the allegations of her first amended complaint, we nevertheless conclude that triable issues of material fact preclude summary judgment.

2. *Wrongful Retaliation and Termination in Violation of Public Policy*

Miller's first two causes of action, wrongful retaliation in violation of public policy and wrongful termination in violation of public policy, generally allege wrongful retaliation based on Miller's reporting of Acevedo's accounting improprieties to Carroll in July of 2011 and on her invocation of CRFA rights. We discuss them together.

Wrongful termination in violation of public policy, sometimes called a *Tameny* action, is a tort. In *Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167, 170, the California Supreme Court stated: "[W]hen an employer's discharge of an employee violates fundamental principles of public policy, the discharged employee may maintain a tort action and recover damages traditionally available in such actions." To prevail on a claim for wrongful termination in violation of public policy, a plaintiff must show that (1) the plaintiff was employed by the defendant,[12] (2) the defendant discharged the plaintiff, (3) the plaintiff's activity was protected by public policy[13] and a substantial motivating reason for the plaintiff's discharge, and (4) the discharge harmed the plaintiff.

_____

[12] "[T]he breach of the employment relationship is an indispensable element of the tort, because it serves factually as the instrument of injury. Thus, there can be no *Tameny* cause of action without the prior existence of an employment relationship between the parties." (*Miklosy v. Regents of University of California* (2008) 44 Cal.4th 876, 900.)

[13] "[F]or a policy to support a wrongful discharge claim, it must be: (1) delineated in either constitutional or statutory provisions; (2) 'public' in the sense that it 'inures to the benefit of the public' rather than serving merely the interests of the individual; (3) well established at the time of the discharge; and (4) substantial and fundamental." (*Stevenson v. Superior Court* (1997) 16 Cal.4th 880, 894.) Administrative regulations promulgated to implement a constitutional or statutory provision may serve as a source of fundamental public policy. (See *Green v. Ralee Engineering Co., supra,* 19 Cal.4th at p. 74.)

(See *Haney v. Aramark Uniform Services*, *Inc.* (2004) 121 Cal.App.4th 623, 641; *Yau v. Allen* (2014) 229 Cal.App.4th 144, 154; CACI No. 2430; cf. *Harris*, *supra*, 56 Cal.4th at p. 232.)

Thus, "[t]o establish a claim for wrongful termination in violation of public policy, an employee must prove causation. (See CACI No. 2430 [using phrase 'substantial motivating reason' to express causation].)" (*Ferrick v. Santa Clara University*, *supra*, 231 Cal.App.4th at p. 1357.) A plaintiff must demonstrate a causal nexus between his or her conduct protected by public policy and an adverse employment action. (See *Turner v. Anheuser-Busch*, *Inc.*, *supra*, 7 Cal.4th at p. 1258.)

In addition, an employee can maintain a tort claim against his or her employer where adverse employment action short of termination has been taken in retaliation for the employee engaging in a protected activity. (See *Garcia v. Rockwell Internat. Corp.* (1986) 187 Cal.App.3d 1556, 1562, abrogated on another point by *Gantt v. Sentry Insurance*, (1992) 1 Cal.4th 1083, 1092-1093, 1095; see CACI No. 2509[14].) The difference between wrongful termination in violation of public policy and wrongful retaliation short of discharge in violation of public policy is "the extent of the damage suffered." (*Garcia v. Rockwell Internat. Corp.*, *supra*, 187 Cal.App.3d at p. 1562.)

Where a plaintiff alleges wrongful retaliation or termination in violation of public policy, California courts apply the burden-shifting framework of *McDonnell Douglas*, *supra*, 411 U.S. 792. (See *Loggins v. Kaiser Permanente Internat.* (2007) 151

---

**[14]** CACI No. 2509 defines adverse employment action as follows: "Adverse employment actions are not limited to ultimate actions such as termination or demotion. There is an adverse employment action if [*name of defendant*] has taken an action or engaged in a course or pattern of conduct that, taken as a whole, materially and adversely affected the terms, conditions, or privileges of [*name of plaintiff*]'s employment. An adverse employment action includes conduct that is reasonably likely to impair a reasonable employee's job performance or prospects for advancement or promotion. However, minor or trivial actions or conduct that is not reasonably likely to do more than anger or upset an employee cannot constitute an adverse employment action."

44

Cal.App.4th 1102, 1108-1109 (*Loggins*).) Under that framework, if the plaintiff employee produces evidence establishing a prima facie case of discrimination or retaliation, a presumption of discrimination or retaliation arises, which is mandatory if unrebutted, and the burden shifts to the defendant employer to rebut the presumption by producing admissible evidence showing that the action was taken for a legitimate, nondiscriminatory or nonretaliatory reason. (See *Guz v. Bechtel National, Inc.*, *supra*, 24 Cal.4th at pp. 355-356 (*Guz*); *Loggins*, *supra*, at p. 1109.) If the employer meets that burden at trial, the presumption of discrimination or retaliation disappears, the employee must present evidence sufficient to prove the employer's proffered reason is a pretext for intentional discrimination or retaliation. (See *Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042; *Guz*, *supra*, at p. 356; *Loggins*, *supra*, at p. 1109; see also *Reeves*, *supra*, 121 Cal.App.4th at p. 112.)

In the context of a summary judgment, where an employer brings a motion for summary judgment and proceeds directly to the second step of the *McDonnell Douglas* framework by presenting evidence of a legitimate reason for adverse employment action, the burden shifts to the employee opposing summary judgment to present sufficient evidence to permit a rational inference that the real reason for the action was intentional discrimination or retaliation. (See *Loggins*, *supra*, 151 Cal.App.4th at pp. 1112-1113; *Guz, supra*, 24 Cal.4th at p. 357; see also Stats. 2011, ch. 419, § 3, p. 4225 [former § 437c, subd. (p)(2)].) "[A]n employer is entitled to summary judgment if, considering the employer's innocent explanation for its actions, the evidence as a whole is insufficient to permit a rational inference that the employer's actual motive was discriminatory [or retaliatory]." (*Guz, supra*, at p. 361, fn. ommitted; see *Aguilar*, *supra*, 25 Cal.4th at p. 850.)

3. *Violation of Government Code Section 12945.2*

The third cause of action is statutory and alleges that Miller suffered retaliatory termination for exercising her rights to leave under the CFRA.[15]  The purpose of the CFRA "is to allow employees to take leave from work for certain personal or family medical reasons without jeopardizing their job security.  [Citation.]"  (*Richey v. AutoNation*, *Inc.*, *supra*, 60 Cal.4th at p. 919.)  "The CFRA has two principal components:  a right to leave of up to 12 weeks in any 12-month period to care for a family member or for the employee's own medical condition (Gov.Code, § 12945.2, subds. (a), (c)(2)(A)), and a right to reinstatement in the same, or a comparable, position at the end of the leave.  (Gov.Code, § 12945.2, subd. (a).)"  (*Ibid.*)

The CFRA makes it an "unlawful employment practice" for an employer to refuse to grant an employee's request for leave to care for a parent who has "a serious health condition."[16]  (Gov. Code, § 12945.2, subds. (a), (c)(3)(B).)  Government Code

---

[15] The CFRA (Gov. Code, §§ 12945.1, 12945.2), is part of the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.).  Consequently, "[a]ny person claiming to be aggrieved by an alleged unlawful practice" prohibited by the CFRA may file an administrative complaint with the California Department of Fair Employment and Housing (DFEH).  (Gov. Code, § 12960, subd. (b).)  "[E]xhaustion of the FEHA administrative remedy is a precondition to bringing a civil suit *on a statutory cause of action.*"  (*Rojo v. Kliger* (1990) 52 Cal.3d 65, 83; see *id*. at p. 88, fn. omitted ["exhaustion is not required before filing a civil action for damages alleging nonstatutory causes of action"].)  Miller's first amended complaint alleged that, on or about May 4, 2012, she filed a complaint of discrimination with the DFEH alleging that she had been "retaliated against, terminated and denied family medical leave *in response to her complaints of financial reporting misconduct* to the Company, her joint employers Danaher Corporation and Molecular Devices," and the DFEH issued a "right-to-sue notice."  (Italics added.)  It is not clear that this right to sue notice covers a claim that defendants terminated Miller in retaliation for exercising CFRA rights.

[16] As relevant here, the phrase " 'a serious health condition' " "means an illness, injury . . . , impairment, or physical or mental condition of . . . a . . . parent . . . of the employee that involves either inpatient care or continuing treatment . . . ."  (Cal. Code Regs., tit. 2, §  11087, subd. (q).)  " 'Inpatient care' means a stay in a hospital, hospice, or residential health care facility, any subsequent treatment in connection with such (continued)

46

section 12945.2, subdivision (l)(1), states: "It shall be an unlawful employment practice for an employer . . . to discharge . . . or discriminate against, any individual because of . . . [¶] [a]n individual's exercise of the right to family care and medical leave provided by subdivision (a)." "The gravamen of a claim under subdivision (l)(1) of Government Code section 12945.2 is the employer's adverse action against the employee in retaliation for the employee's exercise of her right to CFRA leave." (*Dudley v. Department of Transportation* (2001) 90 Cal.App.4th 255, 264.) The essence of Miller's CFRA claim is retaliation.[17]

"[T]he elements of a cause of action for retaliation in violation of CFRA . . . are as follows: (1) the defendant was an employer covered by CFRA; (2) the plaintiff was an employee eligible to take CFRA leave; (3) the plaintiff exercised her right to take leave for a qualifying CFRA purpose; and (4) the plaintiff suffered an adverse employment

---

inpatient care, or any period of incapacity." (Cal. Code Regs., tit. 2, § 11087, subd. (q)(1).) " 'Continuing treatment' means ongoing medical treatment or supervision by a health care provider . . . ." (Cal. Code Regs., tit. 2, § 11087, subd. (q)(3); see Cal. Code Regs., tit. 2, § 11097.) " 'Incapacity' means the inability to work, attend school, or perform other regular daily activities due to a serious health condition, its treatment, or the recovery that it requires." (Cal. Code Regs., tit. 2, § 11087, subd. (q)(2).)

[17] Government Code section 12945.2, subdivision (t), provides: "It shall be an unlawful employment practice for an employer to interfere with, restrain, or deny the exercise of, or the attempt to exercise, any right provided under this section." "[C]ourts have distinguished between two theories of recovery under the CFRA," namely interference claims and retaliation claims. (*Richey v. AutoNation, Inc.*, *supra*, 60 Cal.4th at p. 920.) In interference claims, an employee's claim is that an employer interfered with substantive rights to protected leave. (*Rogers v. County of Los Angeles*, *supra*, 198 Cal.App.4th at pp. 487-488.) In retaliation or discrimination claims, an employee alleges that she suffered an adverse employment action for exercising a CFRA right. (*Richey v. AutoNation, Inc.*, *supra*, at p. 920; *Rogers v. County of Los Angeles*, *supra*, at p. 488.) An employer's intent is irrelevant to a CFRA interference claim but an essential element of a CFRA retaliation claim. (Cf. *Seeger v. Cincinnati Bell Telephone Co., LLC* (6th Cir. 2012) 681 F.3d 274, 282 [FMLA]; *Sanders v. City of Newport* (9th Cir. 2011) 657 F.3d 772, 778 [same]; *Martin v. Brevard County Public Schools* (11th Cir. 2008) 543 F.3d 1261, 1267-1268 [same].)

action . . . because of her exercise of her right to CFRA leave." (*Dudley v. Department of Transportation*, *supra*, 90 Cal.App.4th at p. 261, fn. omitted; see CACI No. 2620 ["CFRA Rights Retaliation—Essential Factual Elements"][18].) We assume for purposes of this appeal that invoking the right to CFRA leave for a qualifying CFRA purpose is a protected activity.[19] (See CACI No. 2620; cf. *Erdman v. Nationwide Ins. Co.* (3d Cir.

---

[18] CACI No. 2620 (Gov. Code, § 12945.2, subd. (l)) states that, to establish a claim for retaliation for exercise of CFRA rights, a plaintiff "must prove all of the following:  [¶]  1 That [*name of plaintiff*] was eligible for [family care/medical] leave; [¶]  2 That [*name of plaintiff*] [[requested/took] [family care/medical] leave/[*other protected activity*]]; [¶]  3 That [*name of defendant*] [discharged/[*other adverse employment action*]] [*name of plaintiff*]; [¶]  4 That [*name of plaintiff*]'s [[request for/taking of] [family care/medical] leave/[*other protected activity*]] was a substantial motivating reason for [discharging/[*other adverse employment action*]] [him/her]; [¶]  5 That [*name of plaintiff*] was harmed; and [¶]  6 That [*name of defendant*]'s retaliatory conduct was a substantial factor in causing [*name of plaintiff*]'s harm."

[19] "Unless an employer waives its employees' notice obligations . . . , an employee shall provide at least verbal notice sufficient to make the employer aware that the employee needs CFRA leave, and the anticipated timing and duration of the leave.  The employee need not expressly assert rights under CFRA or FMLA, or even mention CFRA or FMLA, to meet the notice requirement; however, the employee must state the reason the leave is needed, such as, for example, the expected birth of a child or for medical treatment.  The mere mention of 'vacation,' other paid time off, or resignation does not render the notice insufficient, provided the underlying reason for the request is CFRA-qualifying, and the employee communicates that reason to the employer.  The employer should inquire further of the employee if necessary to determine whether the employee is requesting CFRA leave and to obtain necessary information concerning the leave (i.e., commencement date, expected duration, and other permissible information). An employee has an obligation to respond to an employer's questions designed to determine whether an absence is potentially CFRA-qualifying.  Failure to respond to permissible employer inquiries regarding the leave request may result in denial of CFRA protection if the employer is unable to determine whether the leave is CFRA-qualifying." (Cal. Code Regs., tit. 2, § 11091, subd. (a)(1).)  Under the CFRA, "[i]f the employee's need for a leave pursuant to this section is foreseeable, the employee shall provide the employer with *reasonable advance notice* of the need for the leave." (Gov. Code, § 12945.2, subd. (h), italics added.)  "If the employee's need for leave pursuant to this section is foreseeable due to a planned medical treatment or supervision, the employee shall make a reasonable effort to schedule the treatment or supervision to avoid disruption to the operations of the employer, subject to the approval of the health care (continued)

48

2009) 582 F.3d 500, 509 ["firing an employee for a valid request for FMLA leave may constitute interference with the employee's FMLA rights as well as retaliation against the employee"]; 29 C.F.R. § 825.220(c) [FMLA's "prohibition against interference prohibits an employer from discriminating or retaliating against an employee . . . for having exercised or attempted to exercise FMLA rights"].) CACI No. 2620 "uses the term 'substantial motivating reason' to express both intent and causation between the employee's exercise of a CFRA right and the adverse employment action." (Directions for Use Foll. CACI No. 2620; see CACI No. 2507 [" 'Substantial Motivating Reason' Explained"][20]; cf. *Harris*, *supra*, 56 Cal.4th at p. 232; cf. also *Hite v. Vermeer Mfg. Co.* (8th Cir. 2006) 446 F.3d 858, 865 ["To establish a causal link between the employee's exercise of FMLA rights and her termination, the employee must prove 'that an employer's "retaliatory motive played a part in the adverse employment action." ' [Citation.]"].)

The burden-shifting framework of *McDonnell Douglas*, *supra*, 411 U.S. 792 applies to CFRA retaliation claims based upon circumstantial evidence (see *Nelson v. United Technologies* (1999) 74 Cal.App.4th 597, 613 ; cf. e.g. *Budhun v. Reading Hosp. and Medical Center* (3d Cir. 2014) 765 F.3d 245, 256 [FMLA retaliation claim]; *Brown v. ScriptPro*, *LLC* (10th Cir. 2012) 700 F.3d 1222, 1229 [same]; *Romans v. Michigan*

---

provider of the individual requiring the treatment or supervision." (Gov. Code, § 12945.2, subd. (i).) "An employer may require that employees provide at least 30 days' advance notice before CFRA leave is to begin if the need for the leave is foreseeable based on . . . planned medical treatment for a serious health condition of . . . a family member. The employee shall consult with the employer and make a reasonable effort to schedule any planned medical treatment or supervision so as to minimize disruption to the operations of the employer." (Cal. Code Regs., tit. 2, § 11091, subd. (a)(2).)

[20] CACI No. 2507 states: "A 'substantial motivating reason' is a reason that actually contributed to the [*specify adverse employment action*]. It must be more than a remote or trivial reason. It does not have to be the only reason motivating the [*adverse employment action*]."

*Dept. of Human Services* (6th Cir. 2012) 668 F.3d 826, 842 [same]; but cf. *Sanders v. City of Newport*, *supra*, 657 F.3d at p. 777 [observing that the Ninth Circuit has not decided whether burden-shifting framework of *McDonnell Douglas* applies to FMLA discrimination or retaliation claims but recognizing other circuits have adopted the framework]).[21] Thus, in a CFRA retaliation case, where a defendant employer presents evidence of a legitimate, nonretaliatory reason for discharge of the plaintiff employee in support of a motion for summary judgment, the employee must present sufficient evidence to permit a rational inference that intentional retaliation against the employee for exercising a CFRA right was the real reason for termination. (See *Guz*, *supra*, 24 Cal.4th at p. 357; Stats. 2011, ch. 419, § 3, p. 4225 [former § 437c, subd. (p)(2)]; cf. *St Mary's Honor Center v. Hicks* (1993) 509 U.S. 502, 515 ["[A] reason cannot be proved to be 'a pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason"].)

4. *Evidence of Causation*

Contrary to the trial court's conclusion, the evidence does not establish that a final decision to terminate Miller was reached no later than June 2011 and only implemented later. Even though Miller was classified as "top grade," that classification did not necessarily entail her discharge. As of Acevedo's May 17, 2011 e-mail, Acevedo anticipated that her specific position would be eliminated by the end of the third quarter, but he was contemplating an individual contributor role for her. While a June 9, 2011 chart depicting a proposed reorganization of MD's finance organization excluded Miller, the evidence does not show whether or when it transformed from a plan put forward for consideration to a governing document. In June 2011, Acevedo offered Miller a different

---

[21] The Ninth Circuit has declined "to apply the type of burden shifting framework recognized in *McDonnell Douglas* to FMLA 'interference' claims . . . ." (*Sanders v. City of Newport*, *supra*, 657 F.3d at p. 778.)

organizational role and Miller rejected Acevedo's offer. Although Acevedo concluded that Miller "should eventually be terminated" and "the only option left was to terminate" her, he also believed it was not appropriate to terminate her at that time. Acevedo did not terminate Miller and her employment continued.

As a matter of cause and effect, adverse employment actions that occurred before Miller's July 2011 complaints to Carroll about Acevedo cannot have been prompted by those complaints. Thus, those prior actions, including Miller's top grade classification, the various proposed reorganizations of the MD's finance organization, and Acevedo's June 2011 conclusions about the need for eventual termination of Miller were not causally connected to those complaints. "[T]o prove causation, the cause must come before the effect." (*Muhammad-Smith v. Psychiatric Solutions, Inc.* (2012) 877 F.Supp.2d 552, 559.)

Mohamed, who was hired to replace Tripod, began working for MD and became Miller's direct supervisor in July 2011. At that time, Acevedo did not inform Mohamed of his prior conclusion that Miller should be eventually terminated. No evidence was produced on summary judgment showing that Mohamed was informed of any previous decision to terminate Miller, which was merely awaiting implementation. Rather, the evidence indicated that Mohamed was hired to assess the finance group with "a fresh set of eyes" and to "come to his own conclusions about the employees and organization under his supervision."

After becoming Miller's supervisor and becoming concerned about her performance, Mohamed began keeping a log with respect to his observations with respect to her performance. Acevedo did not reveal to Mohamed that there had been past issues with Miller's performance until Mohamed approached Acevedo with his own concerns about Miller's performance. Mohamed decided to transition certain duties away from Miller.

51

At the beginning of September of 2011, as far as Carroll (VP of Finance) knew, Miller was still "a potential individual contributor." On September 1, 2011, Acevedo apparently informed Carroll in response to an e-mail from Carroll that there was an intention to terminate Miller in the fourth quarter of 2011 and Carroll passed that information onto Davis, Carroll's functional supervisor.

The evidence indicated, however, that before the filing of Miller's complaint in November 2011, neither Acevedo nor Mohamed was aware that, during July 2011, Miller had complained to Carroll about Acevedo's alleged accounting improprieties. Although Miller indicates that she suffered adverse changes to her job responsibilities and the support she received in managing her staff, Miller fails to point to any evidence sufficient to allow a reasonable trier of fact to infer that, when those changes were made, Acevedo or Mohamed had any awareness she made those complaints to Carroll.

An "employee must show that the retaliator knew about her protected activity—after all, one cannot have been motivated to retaliate by something he was unaware of. [Citations.]" (*Medina-Rivera v. MVM, Inc.* (1st Cir. 2013) 713 F.3d 132, 139.) "If the decision maker lacked notice of the protected activity, there can be no causal connection. [Citation.]" (*Vinnett v. General Elec. Co.* (11th Cir. 2008) 271 Fed.Appx. 908, 914.)

Although there was evidence from which it could be inferred that Acevedo and Mohamed became aware of Miller's July 2011 complaints to Carroll about Acevedo's alleged accounting improprieties from the allegations of her original complaint soon after it was filed on November 17, 2011, the temporal proximity of their awareness to (1) Mohamed's subsequent refusals to approve or reconsider his decision to deny Miller's request for time off at the end of December 2011 or (2) Miller's termination on December 13, 2011 is not enough by itself to create a triable issue of fact. Mere "temporal proximity, although sufficient to shift the burden to the employer to articulate a nondiscriminatory reason for the adverse employment action, does not, without more, suffice also to satisfy the secondary burden borne by the employee to show a triable issue

of fact on whether the employer's articulated reason was untrue and pretextual." (*Loggins*, *supra*, 151 Cal.App.4th at p. 1112.)  "Where the employee relies solely on temporal proximity in response to the employer's evidence of a nonretaliatory reason for termination, he or she does not create a triable issue as to pretext, and summary judgment for the employer is proper.  [Citations.]"  (*Arteaga v. Brink's, Inc.* (2008) 163 Cal.App.4th 327, 357.)  In other words, once an employer presents evidence of a nonretaliatory reason for adverse employment action, temporal proximity alone is insufficient to support an inference of a causal connection between a protected activity and an adverse employment action.

The evidence indicates that, sometime in about late November 2011, Mohamed denied Miller's request to take off time during the last week of December 2011.  There was evidence that Mohamed made that decision based on business reasons and he did not change his mind about Miller's time-off request despite her further entreaties during November and December 2011.  Mohamed ultimately informed Miller she was terminated on December 13, 2011.  MD produced evidence that the reason for Miller's discharge was her deficient performance.

Miller contends that whether or not her performance was actually deficient is a disputed issue of fact and the judgment cannot be affirmed based on MD's claim that her allegedly poor performance was a legitimate basis for terminating her.  "[I]f nondiscriminatory [and nonretaliatory], [the employer's] true reasons need not necessarily have been wise or correct.  [Citations.]"  (*Guz*, *supra*, 24 Cal.4th at p. 358.)  An action for unlawful discrimination or retaliation is "not an action for general unfairness."  (*Hersant v. Department of Social Services* (1997) 57 Cal.App.4th 997, 1005 (*Hersant*).)  Courts "do not 'sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent those judgments involve intentional discrimination [or retaliation].' [Citation.]"  (*Stallings v. Hussmann Corp.* (8th Cir. 2006) 447 F.3d 1041, 1052.)

53

"While the objective soundness of an employer's proffered reasons supports their credibility . . . , the ultimate issue is simply whether the employer acted with a *motive to discriminate illegally* [*or retaliate illegally*]." (*Guz*, *supra*, 24 Cal.4th at 358.)  In this context, " 'legitimate' reasons" are reasons that are facially unrelated to prohibited discrimination or retaliation, and which, if true, would thus preclude a finding of discrimination or retaliation.  (See *id*. at p. 358.)  "Examples of legitimate reasons are a failure to meet performance standards (*Trop v. Sony Pictures Entertainment Inc.* (2005) 129 Cal.App.4th 1133, 1149) or a loss of confidence in an employee (*Arteaga v. Brink's, Inc.* (2008) 163 Cal.App.4th 327, 352)." (*Serri v. Santa Clara University*, *supra*, 226 Cal.App.4th at p. 861.)  "The inquiry into pretext centers upon the employer's beliefs, and not the employee's own perceptions of his performance.  [Citations.]" (See *Holifield v. Reno* (11th Cir. 1997) 115 F.3d 1555, 1565; see *Ost v. West Suburban Travelers Limousine*, *Inc*. (7th Cir. 1996) 88 F.3d 435, 441 ["[A] plaintiff's own opinions about her work performance or qualifications do not sufficiently cast doubt on the legitimacy of her employer's proffered reasons for its employment actions.  [Citations.]"].)

The opinions of Dull, who previously supervised Miller when Miller had fewer responsibilities, and Wells, an interim controller who worked at MD for only three months, are not sufficient to support an inference that Acevedo's and Mohamed's opinions regarding Miller's performance in 2011 were not sincere or were a pretext.  "It is the perception of the decision maker which is relevant." (*Smith v. Flax* (4th Cir. 1980) 618 F.2d 1062, 1067.)  Even though Huynh and Patel, two of Miller's subordinates, asserted that they had not complained or had no complaints about her and believed her to be a good manager, there was uncontroverted evidence that a number of others had complained to Acevedo or Mohamed about her.  In addition, what a supervisor perceives as a complaint may be somewhat subjective.  Although Miller states in her declaration that Acevedo did not communicate any concerns about her performance in 2010 or 2011 and Mohamed did not tell her about complaints from Campbell, Liu, or Huynh and the

evidence showed that Miller was not put on a PIP as was standard practice, there was evidence that Acevedo and Mohamed each contemporaneously tracked Miller's performance while serving as her direct supervisor. Acevedo's notes indicated he had received some unfavorable feedback concerning her work and he was coaching her on various matters and Mohamed's log indicated he was observing certain performance issues and working with Miller on goals. Most significant for the issue of causation is the evidence that Acevedo and Mohamed had concerns about Miller's performance long before learning of Miller's lawsuit and becoming aware of Miller's July 2011 complaints to Carroll about Acevedo, which undermines Miller's theory that their professed perception of her problematic performance was a pretext for retaliation based on those complaints.

The evidence as a whole is too weak to support a rational inference that MD's articulated reasons for not granting her time off at the end of December and terminating her were a pretext for intentional retaliation against Miller because she complained to Carroll about Acevedo in July 2011. (See *Guz*, *supra*, 24 Cal.4th at p. 362 ["summary judgment for the employer may thus be appropriate where, given the strength of the employer's showing of innocent reasons, any countervailing circumstantial evidence of discriminatory motive, even if it may technically constitute a prima facie case, is too weak to raise a rational inference that discrimination occurred"].) "There is a genuine issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar v. Atlantic Richfield Co.*, *supra*, 25 Cal.4th at p. 845; cf. *Yanowitz v. L'Oreal USA, Inc.*, *supra*, 36 Cal.4th at p. 1042 ["If the employer produces a legitimate reason for the adverse employment action, the presumption of retaliation ' " 'drops out of the picture,' " ' and the burden shifts back to the employee to prove intentional retaliation. [Citation.]"]; *Guz*, *supra*, 24 Cal.4th at p. 356 ["The ultimate burden of persuasion on the issue of actual discrimination [or retaliation]

55

remains with the plaintiff. [Citations.]"]; cf. also *Hersant*, *supra*, 57 Cal.App.4th at pp. 1004-1005 ["an employee claiming discrimination [or retaliation] must offer substantial evidence that the employer's stated nondiscriminatory [or nonretaliatory] reason for the adverse action was untrue or pretextual, or evidence the employer acted with a discriminatory animus, or a combination of the two, such that a reasonable trier of fact could conclude the employer engaged in intentional discrimination [or retaliation]"].)

As to the alleged retaliation against Miller for requesting family leave (in violation of public policy and statute), Miller contends that the narrow proximity between her request for family leave no later than early November 2011 and her termination on December 13, 2011 "creates a reasonable inference of retaliation." As indicated, temporal proximity, standing alone, is not enough to avoid summary judgment in the face of evidence of a legitimate, non retaliatory reason for discharge. (See *Loggin*, *supra*, 151 Cal.App.4th at pp. 1112-1113.)

Although Miller now contends that she verbally told Mohamed that she was requesting family medical leave no later than December 7, 2011, Miller's declaration merely indicates that, during a meeting with Mohamed that took place no later than December 7, 2011, she "specified [that she] wished to go to Chicago to care for [her] father, who was very ill, and help with his post-cancer follow-up medical appointment." Even assuming that such communication qualifies as notice under the CFRA (see fn. 19, *ante*), the evidence showed that, until her December 12, 2011 e-mail, Mohamed understood that Miller was asking to take vacation. Miller failed to produce evidence sufficient to raise an inference that Mohamed or Acevedo actually understood that Miller was engaging in the protected activity of seeking family leave before her December 12, 2011 e-mail expressly invoking the CFRA and the FMLA.

Even though the evidence indicates Acevedo knew how seriously ill her father had been in 2010 and approved her request to take time off in December 2010 to care for her father, it also indicates that Acevedo did not know the state of health of Miller's father in

56

2011. A reasonable trier of fact could not infer from the evidence that Mohamed or Acevedo knew Miller was engaging in the alleged protected activity of requesting family leave under the CFRA or the FMLA before her December 12, 2011 e-mail. In a retaliation case, " '[e]ssential to a causal link is evidence that the employer was aware that the plaintiff had engaged in the protected activity.' [Citations.]" (*Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 70; see *Brungart v. BellSouth Telecommunications, Inc.* (11th Cir. 2000) 231 F.3d 791, 799 ["A decision maker cannot have been motivated to retaliate by something unknown to him"].)

Miller asserts that "Mohamed's 'about-face' . . . on the crucial need to keep Miller . . . supports a finding that [her] email memorializing her prior CFRA leave request prompted his incredibly rapid turn-around." We agree that the evidence of the circumstances surrounding Miller's termination on December 13, 2011 disclose some incongruous facts that could support a rational inference that Mohamed's ultimate decision to terminate Miller on December 13, 2011 was not based on her performance but rather was causally connected to her express invocation of the CFRA and the FMLA in her December 12, 2011 e-mail.

Although the proffered reason for terminating Miller was her inadequate performance, in a November 22, 2011 e-mail Mohamed stood by his denial of Miller's time-off request for December 2011, emphasizing that Miller's "presence and guidance" for "standards revisions" and "year end" were "vital." In his e-mail sent during the afternoon of December 13, 2011, Mohamed was still expressing the importance of Miller's participation in the year-end close and Mohamed testified in his deposition that, when he wrote that e-mail, he believed Miller's help was needed. Mohamed's December 13, 2011 e-mail informed Miller that he expected her to "ensure tasks under [her] responsibilities are taken care of" and to "lend a hand to the team as a whole" and reiterated that he needed as many hands on deck as possible for the year end. Consequently, a reasonable trier of fact could find that, as late as the afternoon of

57

December 13, 2011, Mohamed was planning for Miller to continue working at least through year-end close.

Even though there was evidence that, in a December 9, 2011 e-mail, Parker gave instructions to HR personnel to prepare the paperwork for Miller's termination, which according to the e-mail was anticipated to occur on Monday December 12, 2011, the e-mail also indicated such timing was "pending a report-out this afternoon on some issues from [Mohamed]" and specified that Mohamed and he would have "another conference call Monday with PK to finalize." It can be inferred from the evidence that Miller's termination was not finalized on December 12, 2011 and Mohamed made the final decision to terminate Miller on December 13, 2011 only *after* he received Miller's December 12, 2011 e-mail invoking the CFRA and FMLA and he responded by e-mail on the afternoon of December 13, 2011.

Although the evidence indicates Acevedo and Mohamed were unhappy with Miller for some time, the termination action took place only after she invoked statutory rights to family leave. There is a suspiciously close temporal connection between Miller's express reliance on the CFRA and the FMLA for the first time in her e-mail sent on the evening of December 12, 2011 and her termination the very next day. "When an adverse employment action 'follows hard on the heels of protected activity, the timing often is strongly suggestive of retaliation.' [Citation.]" (*Collazo v. Bristol-Myers Squibb Mfg., Inc.* (1st Cir. 2010) 617 F.3d 39, 50.)

In addition, there was no evidence that, at the time of her discharge, Miller was informed that she was being terminated due to her deficient work performance. Rather, there was evidence that Miller was provided with the termination paperwork prepared by

58

human resources, which stated MD was eliminating Miller's "job position as a result of [its] decision to restructure and refocus [its] approach to conducting business."[22]

"[A]n employer's failure to articulate clearly and consistently the reason for an employee's discharge may serve as evidence of pretext. [Citations.]" (*Hurlbert v. St. Mary's Health Care System, Inc*. (11th Cir. 2006) 439 F.3d 1286, 1298.) Weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions with respect to an employer's proffered reasons may support an inference of pretext. (See *Hersant*, *supra*, 57 Cal.App.4th at p. 1005.)

We conclude that the evidence as a whole is sufficient to raise triable issues of material fact (1) whether the final decision to terminate Miller was made after her December 12, 2011 e-mail invoking the CFRA and the FMLA and (2) whether Miller's attempt to exercise CFRA/FMLA rights was a substantial motivating reason for her termination on December 13, 2011. "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination [or retaliation], and it may be quite persuasive. [Citation.] In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory [or retaliatory] purpose." (*Reeves v. Sanderson Plumbing Products, Inc.* (2000) 530 U.S. 133, 147.)

MD argues that Miller was required to submit evidence that she engaged in protected activity before adverse employment action was first contemplated, citing *Clark County School Dist. v. Breeden* (2001) 532 U.S. 268, 272 (*Breeden*) (*per curiam*). In *Breeden*, the United States Supreme Court found it immaterial that an employee was transferred one month after the employee's supervisor learned of the employee's

---

**[22]** "Invocation of a right to downsize does not resolve whether the employer had a discriminatory [or retaliatory] motive for cutting back its work force, or engaged in intentional discrimination [or retaliation] when deciding which individual workers to retain and release." (*Guz*, *supra*, 24 Cal.4th at p. 358.)

Title VII lawsuit since the school district was contemplating the transfer before it learned of the lawsuit. (*Ibid*.) The court stated: "Employers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality." (*Ibid*.)

*Breeden* may be distinguished from this case. Unlike the employee in *Breeden*, Miller has presented more than mere temporal proximity to establish a causal link between her express invocation of the CFRA and the FMLA in her December 12, 2011 e-mail and her termination the next day. Here, the closeness of those events combines with other circumstantial evidence that Mohamed was insisting that Miller participate in year-end close only a short time before her termination. In addition, the interval between those events was exceptionally close, less than 24 hours.

We find that the circumstantial evidence is sufficient to support (but not to compel) a rational inference that retaliatory animus against Miller for attempting to exercise family leave rights under the CFRA and the FMLA was a substantial motivating factor in Mohamed's final decision to terminate her on December 13, 2011. Each of the three causes of action includes a retaliation claim based upon an attempt by Miller to exercise family leave rights. Accordingly, MD was not entitled to either summary judgment or summary adjudication.[23]

II

*Danaher's Motion for Summary Judgment*

"An employee who seeks to hold a parent corporation liable for the acts or omissions of its subsidiary on the theory that the two corporate entities constitute a single

---

**[23]** "A motion for summary adjudication shall be granted only if it completely disposes of a cause of action, an affirmative defense, a claim for damages, or an issue of duty." (Stats. 2011, ch. 419, § 3, p. 4223 [former § 437c, subd. (f)(1)]; see 437c, subd. (f)(1) [operative Jan. 1, 2015].)

employer has a heavy burden to meet under both California and federal law. Corporate entities are presumed to have separate existences, and the corporate form will be disregarded only when the ends of justice require this result. (*Mesler v. Bragg Management Co.* (1985) 39 Cal.3d 290, 300 [alter ego liability]; *Mid-Century Ins. Co. v. Gardner* (1992) 9 Cal.App.4th 1205, 1212 [same].) In particular, there is a strong presumption that a parent company is not the employer of its subsidiary's employees. (*Frank v. U.S. West, Inc.* (10th Cir.1993) 3 F.3d 1357, 1362.)" (*Laird v. Capital Cities/ABC, Inc.* (1998) 68 Cal.App.4th 727, 737.)

Miller maintains that disputed issues of material fact exist with respect to the issue whether Danaher was her co-employer and, therefore, Danaher's separate motion for summary judgment cannot be granted. Since the trial court found Danaher's motion was moot and never ruled on it, the court must consider it in the first instance upon remand.

### *Disposition*

The judgment is reversed. Upon remand, the trial court shall consider Danaher's motion for summary judgment.

_____

ELIA, J.

WE CONCUR:

_____

RUSHING, P. J.

_____

WALSH, J.[*]